**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Lindsay S. Moilanen**
**Nancy A. Brown**
**Wesley Wintermyer**
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004**
**(212) 336-1021 (Moilanen)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

**SECURITIES AND EXCHANGE**      :
**COMMISSION,**      :
     :
              **Plaintiff,**      :     **23 Civ.   (   )**
     :
           **v.**      :
     :     **COMPLAINT AND**
**CHARLIE JAVICE,**      :     **JURY DEMAND**
     :
              **Defendant,**      :
     :
           **-and-**      :
     :
**CHARLIE JAVICE, in her capacity as Trustee**      :
**for the CHARLIE JAVICE 2021**      :
**IRREVOCABLE TRUST #1, and CHARLIE**      :
**JAVICE 2021 IRREVOCABLE TRUST #2,**      :
     :
              **Relief Defendants.**      :
-------------------------------------------------------- x

        Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant Charlie Javice ("Javice"), and Javice in her capacity as Trustee for Relief Defendants

Charlie Javice 2021 Irrevocable Trust #1 and Charlie Javice 2021 Irrevocable Trust #2

(collectively, "Relief Defendants") alleges as follows:

## SUMMARY

1.      In the summer of 2021, Javice sold the company she founded, Frank,[1] for $175 million to JPMorgan Chase Bank, N.A. ("JPMC").  Through the deal, JPMC was eager to acquire the identity information of the 4.25 million customers—purportedly students looking to finance their educations—that Javice repeatedly claimed Frank had collected.  JPMC had been seeking to expand its market share for financial services and products to the largely untapped student segment of the population and hoped to use Frank's customer information to target those prospects.

2.      But, as Javice knew, Frank did not have 4.25 million student customers or their identifying information.  Javice, Frank's CEO, understood that Frank's customer data was the asset that JPMC wanted, and that JPMC would not pursue an acquisition if it knew the truth: that Frank in fact had identifying data for only about 300,000 students.  Therefore, to ensure that JPMC went forward with the transaction, Javice embarked on a fraudulent scheme to (1) hide the fact that Frank had identifying data for only about 300,000 students; and (2) fabricate data to falsely support Javice's claims.

3.      Prior to the acquisition (which was documented as a merger), Javice repeatedly touted that Frank had 4.25 million customers, and explained in one-on-one meetings with JPMC employees that those 4.25 million customers were students who had provided a first name, last name, email address, and phone number to Frank.  When JPMC asked to review the customer data, Javice paid a university professor to create fake data appearing to represent 4.25 million customers.  Javice then provided that list of 4.25 million data entries to a third-party validator, who in turn reported it to JPMC.

---

[1]      The legal name for the company was TAPD, Inc. "Frank" was a doing-business-as alias.

4.      Knowing that JPMC would have access to Frank's real and much more limited student data after the close of the acquisition, Javice and another high-ranking Frank executive (the "Frank Executive") began an effort to create a list of real names that they could pass off as Frank's customers.  To that end, the Frank Executive arranged for Frank to pay $105,000 to a third party data compiler for its in-college student data.  Javice arranged for Frank to pay $75,000 to a different data compiler to augment the list the Frank Executive bought with email and phone number data.

5.      But, after the merger when JPMC used those sham lists to test a marketing campaign for its financial services to a sample of what it thought were Frank's customers, its campaign reached few of the intended recipients, and its marketing email was opened by a fraction of those it did reach.

6.      JPMC conducted an internal investigation through which it learned that Frank had no list of 4.25 million legitimate users and that Javice had engaged in a months-long scheme to fabricate the data that she knew JPMC was paying $175 million to acquire.

## **VIOLATIONS**

7.      By virtue of the conduct alleged herein, Javice has violated, directly or indirectly, singly or in concert, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      Unless Javice is restrained and enjoined, she will engage in the acts, practices, transactions and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.     The Commission brings this action pursuant to the authority conferred upon it by

Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Sections

21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking a final judgment:  (a) permanently

enjoining Defendant from engaging in the acts, practices and courses of business alleged against

them herein; (b) ordering Defendant to disgorge all ill-gotten gains and to pay prejudgment

interest on those amounts pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15

U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendant to pay civil money

penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendant

from acting as an officer or director of a public company pursuant to Section 20(e) of the

Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.

§ 78u(d)(2)]; (e) ordering Relief Defendants to pay, with prejudgment interest, all ill-gotten gains

by which they were unjustly enriched, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of

the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; and (f) ordering such other

and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15. U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15. U.S .C. § 78aa].

11.     Defendant, directly and indirectly, has made use of the means or instrumentalities

of interstate commerce, or of the mails, or of a facility of a national securities exchange, in

connection with the transactions, acts, practices, or courses of business alleged herein.

12.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)],

and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and

courses of business alleged in this Complaint occurred within this District, including that

employees of JPMC involved in the Frank acquisition worked from JPMC's Manhattan offices,

Frank was represented in the acquisition negotiations by investment bankers located in

Manhattan, and negotiations over the terms of the acquisition, including at least two in-person

meetings involving Defendant, took place here.

## DEFENDANT

13.     **Javice**, age 31, resides in Miami Beach, Florida.  At all times relevant here,

Javice was the founder, CEO and a stockholder of TAPD, Inc., a for-profit company,

incorporated in Delaware in 2013, which began doing business as "Frank" in 2017.  As founder

and CEO, at all relevant times, Javice was the public face of Frank, and was the chief negotiator

on behalf of Frank in its acquisition discussions with JPMC.  Javice signed the merger agreement

with JPMC on behalf of TAPD, Inc.  At the time of Frank's acquisition, Javice controlled 8

million shares of TAPD, Inc. common stock and 2.5 million common stock warrants.  She

received approximately $9.7 million directly in proceeds from the merger, and millions more

indirectly, through the amounts JPMC paid to the Relief Defendants for Javice's benefit.  As part

of the acquisition, JPMC appointed Javice to a managing director position at JPMC and gave her

an employment agreement that included a $20 million retention bonus.

## RELIEF DEFENDANTS

14.     **Charlie Javice 2021 Irrevocable Trust #1** ("Javice Trust 1") is a Nevada trust

for which Javice acts as Trustee.  Javice formed the Javice Trust 1 in September 2021.  Pursuant

to the merger agreement by which JPMC acquired Frank (the "Merger Agreement"), JPMC

directed $4,700,000.11 of the merger consideration (minus amounts charged as selling expenses

and amounts escrowed as holdbacks) to Javice Trust 1.

15.     **Charlie Javice 2021 Irrevocable Trust #2** ("Javice Trust 2") is a Nevada trust for which Javice acts as Trustee.  Javice formed the Javice Trust 2 in September 2021.  Pursuant to the Merger Agreement, JPMC directed $6,999,999.96 of the merger consideration (minus amounts charged as selling expenses and amounts escrowed as holdbacks) to Javice Trust 2.[2]

## RELEVANT ENTITIES

16.     **Frank** was the doing-business-as name of TAPD, Inc., a Delaware corporation, with its principal place of business in New York, New York.  Javice founded Frank in 2017. Javice sought to make Frank a trusted online source to help students navigate every aspect of the college financial aid process.  Frank offered students a tool to expedite completion of the Free Application for Federal Student Aid ("FAFSA"), a time-consuming task required of students seeking federal grants and loans.  As it grew, Frank also provided students with information on scholarships, financial aid appeals, and college courses.[3]

17.     **JPMC** is a large financial institution, headquartered in Columbus, Ohio.  It acquired Frank in a merger transaction for $175 million in mid-September 2021.

18.     **Investment Bank** is a boutique investment and merchant bank that Javice hired to help Frank find additional investors or to identify a possible acquirer and advise it on any resulting transaction.  Javice was the primary source for the information that Frank's Investment Bank offered potential investors and acquirers.

---

[2]     Charlie Javice 2021 Irrevocable Trust #3 ("Javice Trust 3") (also a Nevada trust for which Javice acts as Trustee), was similarly set to receive merger proceeds pursuant to the Merger Agreement.  However, all of the $7,133,805.83 consideration to be paid to the Javice Trust 3 was held in escrow and has not been paid out to Javice Trust 3.

[3]     JPMC ceased operating the Frank website in January 2023.

**FACTS**

19.     By 2021, Frank had grown to an online resource for pre-college and college-interested students across the country.

20.     Frank's primary offering was its automated tool for quick completion and submission of the FAFSA, which attracted students looking for financial aid to finance their educations.  Frank claimed that its automated tool allowed students to complete the FAFSA in a fraction of the time that it typically took to enter the required data manually.

21.     By 2021, Frank had expanded into other areas of interest to these students.  It offered information on available scholarships, resources for pursuing financial aid appeals, and a market place for available online college courses offered by third parties.

22.     In presentations Frank made to potential acquirers in 2021, Frank claimed that it was "the trusted financial coach for students" and that its mission was "helping [students] navigate finances from A-Z."

23.     In 2021, Frank's website claimed that "4.25 million students choose Frank."

***Frank's Efforts to Sell Itself***

24.     Since inception, Frank had financed its operations and growth primarily through money raised in private placements of its common and preferred stock.

25.     On January 25, 2021, Frank's General Counsel (the "General Counsel"), signed an engagement letter with the Investment Bank on behalf of Frank (the "IB Agreement").  Pursuant to that agreement, the Investment Bank was to act as Frank's "exclusive financial advisor" in connection with any possible transaction by which Frank would merge with or sell itself to a third party.

26.     Under the terms of the IB Agreement, Frank agreed that it would be "solely

responsible for the accuracy and completeness of the Offering Materials and represents and warrants that the Offering Materials will not contain any untrue statement of a material fact or omit to state a material fact required to be stated . . . or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading."

27.    Javice read and approved the IB Agreement.

28.    Over the next few months, Investment Bank employees worked with Javice, the Frank Executive, and the General Counsel to create pitch decks describing Frank's products and market reach (including data related to the number of users), its financials and anticipated growth, potential new product offerings, and the status and pipeline of its contracts with third-parties for cross-marketing partnerships.

29.    The Investment Bank also worked with Javice, the Frank Executive, and the General Counsel to populate a virtual data room with Frank data purporting to support the information in the pitch decks; the data room would be opened to prospective acquirers for their review.

30.    Javice reviewed and approved all pitch decks sent to potential acquirers.

31.    By May 2021, Frank had entered into acquisition negotiations with one financial institution, and Javice presented a pitch deck to that institution touting that there were "4.25mm Frank Students & Growing."  The large financial institution considered acquiring Frank in order to market its financial products to what it believed was Frank's user base of 4.25 million students; ultimately, however, the financial institution decided not to acquire Frank.

32.    In early 2021, a Frank board member approached JPMC about a possible acquisition of Frank.  At this time, JPMC was focused on growing its market share of student customers and was interested in the leads that Frank offered in that market segment given its

touted engagement with over 4 million college-age or college-ready students.

33.     Frank's pitch deck, provided in early July 2021 to JPMC and approved by Javice, included a slide that represented that Frank had "4.25mm Students and Growing." The 4.25 million student figure was repeated on five additional slides in the pitch deck.

34.     After JPMC signed a non-disclosure agreement with Frank, Frank and the Investment Bank opened Frank's data room to JPMC on July 6, 2021.

35.     Several documents concerning customer data were uploaded to the data room with Javice's approval. One spreadsheet included a column labeled "FAFSA in Process" purporting to show 4,265,085 customers who had started to fill out a FAFSA form using Frank's online tool. The spreadsheet showed that 2.1 million students had fully completed a FAFSA through Frank.

36.     In later meetings, Javice explained that to begin the FAFSA process through Frank, a user would first open an account and submit his or her name, email address, and phone number.

37.     On July 12 and July 13, 2021, JPMC employees met with Frank representatives, including Javice and the Frank Executive, in Manhattan to discuss the information in the data room and to gain a better understanding of Frank's products and customer base. During both all-day meetings, Javice fielded most of the questions on behalf of Frank.

38.     At those meetings, Javice knowingly or recklessly confirmed the false statements in the data room and the substance of her public statements about the size and nature of Frank's "users": she claimed that Frank had 4.25 million users.

39.     As Javice defined it at those meetings, a "user" was a Frank website visitor who created a Frank account by submitting their first name, last name, email address, and phone

number to Frank.  She differentiated "user" from "visitor," explaining that Frank had more than 35 million visitors to its website, but that those visitors would be counted as "users" only when they submitted their name, email, and phone number information.

40.     The kinds of identifying information that had purportedly been provided by Frank users were valuable to JPMC in its efforts to market to and attract new customers in the student population because it would allow JPMC to target those students already familiar with Frank and its financial aid services with marketing materials about JPMC's broader array of financial products and services.

41.     Javice understood that the student identifying information that Javice claimed Frank had collected was important to JPMC.

42.     As Javice knew, or was reckless in not knowing, the 4.25 million user number was false.  In fact, Frank had the name, email address, and phone number information for only a fraction—approximately 300,000—of those students.

43.     Javice presented the false number of users to JPMC repeatedly in multiple due diligence meetings and calls with JPMC.

44.     On July 14, 2021, JPMC submitted a non-binding indication of interest to acquire Frank's outstanding stock for $175 million, subject to confirmatory due diligence.  Frank agreed to grant JPMC a 14-day period of exclusivity, during which JPMC conducted additional due diligence, including additional in-person meetings on July 19 and July 20, 2021.

45.     As part of its due diligence and follow-up requests, JPMC asked Javice to provide a list of Frank's customer accounts that included the identifying information Javice had represented Frank possessed.  Javice attempted to dodge requests for specific details to support her "user" claims, citing privacy concerns over sharing such personal identifying information

with a third party. But JPMC insisted.

46. In an August 1, 2021 email, JPMC employees asked: "How many customer accounts have 100% of the below data?," referring to first names, last names, dates of birth, phone numbers, mailing addresses, and email addresses. The email also requested the following information: "How many customer accounts have partial information? Of partial records, what % include each data field below?"

47. Later that day, JPMC stressed that these were "critical confirmatory due diligence requests" that were "conditions to closing the transaction."

### *Javice and the Frank Executive Arranged for Fabricated Data to Be Supplied to JPMC to Support Javice's False User Representations*

48. With the exclusivity period at an end, both JPMC and Javice and the Frank Executive worked to resolve the conflict between JPMC's desire to verify Frank's user claims and Frank's stated privacy concerns.

49. JPMC proposed and Javice accepted the use of a third-party validator (the "Validator"). Pursuant to a data services and non-disclosure agreement with the Validator, Frank would provide the Validator with "up to 4 million records of customer data," without certain personal identifiable information, and the Validator would "validate the coverage of the attribute data" and "then provide a written report regarding the coverage of the attribute data" to JPMC without disclosing any of the actual data Frank supplied. Specifically, the validation report would report to JPMC "[h]ow many UNIQUE customer accounts exist."

50. Javice and the Frank Executive recognized that they would have to fabricate data to supply to the Validator to hide the fact that Frank actually had identifying information for only a fraction of the 4.25 million users that Javice had claimed.

51. Javice and the Frank Executive agreed that they should ask Frank's Director of

11

Engineering (the "Engineering Director") to supply the missing users by creating "synthetic data" of the users' existence and identifying information.

52.     On August 1, 2021, Javice emailed the Frank Executive and the Engineering Director a spreadsheet that purported to show that Frank had 4,265,085 website visitors with a "FAFSA in Process."  The spreadsheet contained certain general demographic data regarding these visitors on a cumulative basis, such as their geographic location and degree interest. However, the spreadsheet did not contain their names, email addresses, phone numbers, or other identifying information.

53.     On August 2, 2021, Javice emailed the Engineering Director a link to a website that described how to "generate synthetic data that is similar to the actual data in terms of statistics and demographics."

54.     In a Zoom call later on August 2, 2021—among the Engineering Director, Javice, and the Frank Executive—the Frank Executive explained to the Engineering Director that he and Javice wanted him to take the information available on the 4.265 million visitors and use synthetic data techniques to generate identifying information (e.g., names, email address, and phone numbers) for those visitors, using the same demographics present in the real data (e.g., geographic location and degree interest).

55.     Previously, in connection with due diligence meetings with JPMC attended by the Engineering Director, Javice had directed the Engineering Director not to discuss Frank's user metrics in terms of actual numbers with JPMC.

56.     During the call with the Frank Executive and Javice, the Engineering Director was uneasy with their request.  Fearing that the synthetic data mimicking actual user data that they were asking him to create might be used to attract investors, the Engineering Director asked

the Frank Executive and Javice whether creating such synthetic data was legal.  Javice assured

him that it was and responded that no one would end up in "orange jumpsuits."

57.     The Engineering Director refused to comply with Javice's and the Frank

Executive's request to create synthetic data.  Instead, on August 2, 2021, the Engineering

Director forwarded Javice a link to the data of Frank's actual users for whom it had identifying

information.  As the Engineering Director explained to Javice in a separate message, the data

showed "142K" individuals who had "applications at least started."  Javice directed the

Engineering Director also "to count users who don[']t have an application."  The Engineering

Director responded:  "if [I] count users with no fafsa [sic] applications, we get ~293192 records."

Javice responded:  "Exactly."

58.     Unable to obtain the fabricated data from the Engineering Director, Javice then

turned outside Frank for help.  On the same day the Engineering Director declined Javice's and

the Frank Executive's request, Javice reached out to a data science professor at a local university

whom she had met in college (the "Data Science Professor").

59.     On August 3, 2021, Javice provided the Data Science Professor with the list of the

fewer than 300,000 users that Frank had actually acquired, and retained him to use "synthetic

data" to create 4.265 million customer names, addresses, email addresses, birthdays, and other

identifying information requested by JPMC.

60.     Thereafter, in a series of messages, Javice guided the Data Science Professor in

creating a list of fake user data, answering questions from him about how the data should look.

61.     For example, Javice confirmed that the Data Science Professor would "sample

first name and last name independently and then ensure none of the sampled names are real."

62.     For address information, Javice and the Data Science Professor agreed that while

real addresses would not be used, street names would match actual street names located in the state for that address.

63.     The Data Science Professor warned that because the information he was supplying indicated that many of the "students" were living, and attending high school and college in the same town and state, it "would look fishy" if someone "were to audit it."

64.     When the Data Science Professor advised that it would be difficult to create real-looking email addresses, Javice suggested that he instead insert a "unique ID."  Unique IDs are commonly used to share sensitive real information by replacing the real data with a unique, and random, alphanumeric string.  But Javice was suggesting their use to conceal the obviously fake data, and to create the misimpression that real, but sensitive, data was being protected.

65.     On August 4, 2021, Javice provided the Data Science Professor with a draft data validation "report [that they] would need to make sure matches" to the data that the Data Science Professor was working to generate.  The report was already preloaded with counts showing that Frank had 4,265,085 unique customer accounts with a first name, last name, email address, and phone number.

66.     On August 5, 2021, the Data Science Professor finished generating a list of exactly 4,265,085 "user" accounts with a first name, last name, email address (provided as a Unique ID), and phone number, along with varying degrees of other identifying information.

67.     That same day, Javice directed the Data Science Professor to submit his list of 4.265 million synthetically-generated users to the Validator.

68.     After its review of the data, the Validator advised Javice in an August 5, 2021 email that it had validated that certain fields were "populated versus null/blank."  The Validator attached its "Validation" report that reflected that 100% of the 4,265,085 entries it reviewed had

data in the first name, last name, email address, and phone fields.

69.     Javice authorized the Validator to release the report to JPMC, but asked that it "not share additional background" with JPMC.

70.     After the report was delivered to JPMC, Javice requested that the Validator delete the data that Frank had provided through the Data Science Professor.

71.     With their fabricated data now successfully "validated," Javice paid the Data Science Professor for his services.  On August 5, 2021, and in response to his invoice for $13,300, which detailed the work he performed creating the synthetic data, Javice told the Data Science Professor to send back an invoice for $18,000, giving him a bonus.  To avoid creating written evidence of the fabrication, she also requested that he prepare a new invoice containing "just one line item for data analysis."

### In Anticipation of JPMC's Access to the Data Post-merger, Javice and the Frank Executive Bought Data to Cover Up their Earlier Deceptions

72.     On August 8, 2021, JPMC and Frank entered into the definitive Merger Agreement and set the closing date for September 14, 2021.  Javice signed the Merger Agreement on behalf of TAPD, Inc., as its CEO.  Pursuant to the Merger Agreement's terms, JPMC acquired all of Frank's outstanding common and preferred stock for total consideration of $175 million, and Javice, the Frank Executive, and others from Frank were offered positions with JPMC post-merger.  Javice was entitled to a $20 million retention bonus.

73.     Javice's employment offer, which she signed on August 4, 2021, stated that performance indicators of her new job would include "expand[ing] [Frank's] engaged customer user base of 4.25 MM households to 10MM+ households over the next three years."

74.     Javice and the Frank Executive anticipated that, after the closing, JPMC would soon ask for the full data of Frank's purported list of 4.25 million users.  Recognizing that their

scheme would immediately be unmasked if they delivered the data that the Data Science

Professor had fabricated, Javice and the Frank Executive scrambled to buy data from data

providers that at least matched real students, even if those students never had a connection to

Frank.

75.     To that end, even before the Merger Agreement was signed, the Frank Executive

reached out to Data Compiler 1.  Data Compiler 1 is a marketing company that boasts "the most

comprehensive, accurate and responsive data of high school students, college students, and

young adults available anywhere."  On August 2, 2021, the Frank Executive asked Data

Compiler 1 how much it would cost to buy its "list of students currently in college."

76.     After a series of negotiations between the Frank Executive and Data Compiler 1,

on August 6, 2021, Javice approved the payment of $105,000 for Data Compiler 1's list of 4.5

million students.  Data Compiler 1, however, was only able to provide email addresses for fewer

than 3 million of those students, and it offered no telephone numbers.

77.     When Javice learned from the Frank Executive that Data Compiler 1's list would

not include phone numbers, on August 6, 2021, Javice texted the Data Science Professor.  She

wrote:  "Weird question – if I have names, emails, physical address for contacts – can we

augment the data with phone numbers from white pages database?"  The Data Science Professor

agreed to work on the issue and asked her to send him a test batch of data files to which the

phone numbers would be appended.

78.     On August 10, 2021, the Data Science Professor contacted Data Compiler 2.  Data

Compiler 2 is a public records aggregator.  At Javice's direction, the Data Science Professor

informed Data Compiler 2 that the data sought would be used to "enrich . . . contacts."

79.     Javice sent the Data Science Professor the Data Compiler 1's student data that the

Frank Executive had sent her.  On August 23, 2021, the Data Science Professor sent the Data

Compiler 1's data to Data Compiler 2 and asked that they identify matching phone numbers and

email addresses associated with that data.

80.     Data Compiler 2 was able to provide email addresses for less than half of the

students in Data Compiler 1's data.  On August 29, 2021, Javice instructed Data Compiler 2 to

run the student information through their database with just the address information from the

Data Compiler 1 list in an effort to increase the email hits, essentially instructing Data Compiler

2 to provide email addresses found for any person located at the provided address, whether the

student or not (the "household email data").

81.     Javice's proposed search parameters increased the number of emails retrieved.

On September 9, 2021, Data Compiler 2 emailed Javice and the Data Science Professor data

containing approximately 1.9 million email addresses for the approximately 4.5 million student

records obtained from Data Compiler 1.

82.     Frank paid Data Compiler 2 $75,000 for its data.

83.     With the data bought from Data Compiler 1 and Data Compiler 2 combined,

Javice and the Frank Executive now had a list of approximately 4.5 million students with

identifying information.  Because Frank, through its own business, had attracted only 300,000

students who provided their email, phone number, and other personal identifying information,

few (if any) on the lists Javice and the Frank Executive had caused Frank to purchase represented

students who had actually interacted with Frank.

### *JPMC Discovered Javice's Fraudulent Scheme*

84.     The acquisition closed on September 14, 2021, and Javice and the Frank

Executive, and a few other Frank employees, became employees of JPMC.

85.     By January 2022, Javice and the Frank Executive were still working on the Frank product as JPMC employees.

86.     In January 2022, JPMC sought to begin the cross-marketing of JPMC's financial products to Frank's users.

87.     On January 6, 2022, a team of JPMC employees asked the Frank Executive for the Frank user data that Javice had told JPMC that Frank possessed, and which had supposedly been validated by the Validator.

88.     On January 21, 2022, Javice directed a Frank engineering employee to provide JPMC's marketing team with the data the Frank Executive had bought from Data Compiler 1. The engineering employee did so and, in a later email internal to the Frank group (including Javice and the Frank Executive), the Frank engineering employee confessed that he was "not sure about the source of the data" that he had sent JPMC's team.

89.     Later, in early February 2022, Javice sent the marketing team an edited version of the combined Data Compiler 1 list with the data obtained from Data Compiler 2, which included the household email data (the "Augmented List").  Despite knowing that both lists had been bought from commercial data aggregators and did not represent actual Frank users, Javice told no one at JPMC that the Augmented List contained data that came from anywhere other than Frank.

90.     In July 2022, JPMC's marketing team sampled 400,000 names from the Augmented List to launch a test email marketing JPMC's financial services to what it thought were Frank users.  Of the emails sent to the sample, only 28% of the emails were confirmed delivered to an operational email address, and just 1.1% of those were opened by the recipient. Both statistics were far below the typical delivery success rates experienced by JPMC for its

email campaigns.

91.     JPMC conducted an internal investigation regarding the poor results from the

email marketing campaign.  Because Frank's historic emails and data had been transferred to

JPMC as part of the merger, JPMC discovered Javice's conversations with the Data Science

Professor about creating synthetic data to provide to the Validator and the Data Compiler 1 list

that the Frank Executive had purchased.

92.     As a result of that investigation, JPMC learned that Frank had no list of 4.25

million legitimate users with the identifying information Javice had represented it possessed and

that Javice and the Frank Executive had engaged in a months-long scheme to fabricate the data

that both of them knew JPMC was paying $175 million to acquire.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Javice)

93.     The Commission realleges and incorporates by reference herein each and every

allegation in paragraphs 1–92.

94.     Javice, directly or indirectly, singly or in concert with others, and in the offer or

sale of securities, by use of the means or instruments of transportation or communication in

interstate commerce or by use of the mails, (1) knowingly or recklessly has employed one or

more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has

obtained money or property by means of one or more untrue statements of a material fact or

omissions of a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, and (3) knowingly, recklessly, or

negligently has engaged in one or more transactions, practices or courses of business which

operated or would operate as a fraud or deceit upon a purchaser.

95.     By virtue of the foregoing, Javice, directly or indirectly, has violated, and unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Javice)

96.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–92.

97.     Javice, directly or indirectly, singly or in concert with others, and in connection with the purchase or sale of a security, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange (1) to knowingly or recklessly employ one or more devices, schemes, or artifices to defraud; (2) to knowingly, recklessly or negligently make one or more untrue statements of a material fact or to omit to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) to knowingly, recklessly or negligently engage in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

98.     By virtue of the foregoing, Javice violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendants Javice Trust 1 and Javice Trust 2)

99.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–92.

100.     Javice Trust 1 and Javice Trust 2 each received proceeds from JPMC pursuant to the Merger Agreement.

101.     Neither Javice Trust 1 nor Javice Trust 2 has any legitimate claim to those ill-gotten gains.

102.     Javice Trust 1 and Javice Trust 2 each obtained the funds under circumstances in which it is not just, equitable, or conscionable for any of them to retain the funds.

103.     Javice Trust 1 and Javice Trust 2 each has therefore been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Javice, and her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S .C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

### II.

Ordering Javice to disgorge all ill-gotten gains she received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

### III.

Ordering Javice to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Javice from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

### V.

Ordering Relief Defendants Javice Trust 1 and Javice Trust 2 to pay, with prejudgment interest, all ill-gotten gains by which each of them was unjustly enriched, pursuant to Exchange

Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and

## VI.

Granting such other and further relief as this Court deems just and appropriate.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
        April 4, 2023

SECURITIES AND EXCHANGE   COMMISSION

By:      /s/ Antonia M. Apps
         Antonia M. Apps
         Tejal D. Shah
         Lindsay S. Moilanen
         Nancy A. Brown
         Wesley Wintermyer[4]

New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1021 (Moilanen)
Email:  moilanenl@SEC.GOV

Attorneys for the Plaintiff

---

[4]      Not admitted in the Southern District of New York. *Pro hac vice* motion forthcoming.