# EXHIBIT I

Approved: _____
MICAH F. FERGENSON / DINA MCLEOD
Assistant United States Attorneys

Before: THE HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - x

**23 MAG 2638**

UNITED STATES OF AMERICA                :     **SEALED COMPLAINT**

            - v. -                      :     Violations of 18 U.S.C. §§ 1343, 1344,
                                              1349, & 2; 15 U.S.C. §§ 645(a), 78j(b)
CHARLIE JAVICE,                         :     & 78ff; and 17 C.F.R § 240.10b-5.

                    Defendant.          :     COUNTY OF OFFENSE:
                                              NEW YORK
                                        :
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JEREMY ROSENMAN, being duly sworn, deposes and says that he is a Special Agent
with the United States Attorney's Office for the Southern District of New York and charges as
follows:

## COUNT ONE
### (Conspiracy to Commit Wire and Bank Fraud)

        1.      From at least in or about June 2021 through at least in or about November 2022, in
the Southern District of New York and elsewhere, CHARLIE JAVICE, the defendant, and others
known and unknown, willfully and knowingly combined, conspired, confederated, and agreed
together and with each other to commit wire fraud, in violation of Title 18, United States Code,
Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

        2.      It was a part and an object of the conspiracy that CHARLIE JAVICE, the defendant,
and others known and unknown, knowingly having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit and caused to be transmitted by
means of wire, radio, and television communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which
affected a financial institution, in violation of Title 18, United States Code, Section 1343, to wit
JAVICE and others engaged in a scheme to obtain money from J.P. Morgan Chase ("JPMC"), a
bank headquartered in New York, New York, by submitting false statements and representations
about her company TAPD, Inc., d/b/a Frank ("Frank") to JPMC, in order to induce JPMC to

acquire Frank for approximately $175 million, and in furtherance thereof, JAVICE transmitted and caused to be transmitted electronic communications and monetary transfers to and from the Southern District of New York.

3.        It was further a part and an object of the conspiracy that CHARLIE JAVICE, the defendant, and others known and unknown, knowingly would and did execute a scheme and artifice to defraud a financial institution as defined in Title 18, United States Code, Section 20, to wit, JPMC, and to obtain monies, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, JAVICE submitted false statements and representations about Frank to JPMC in order to fraudulently induce JPMC to acquire Frank for approximately $175 million.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

4.        From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, JAVICE engaged in a scheme to obtain money from JPMC, by submitting false statements and representations about Frank to JPMC, in order to induce JPMC to acquire Frank for approximately $175 million, and in furtherance thereof, JAVICE transmitted and caused to be transmitted electronic communications and monetary transfers to and from the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Bank Fraud)

5.        From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution as defined in Title 18, United States Code, Section 20, to wit, JPMC, and to obtain monies, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, JAVICE engaged in a scheme to obtain money from JPMC, by submitting false statements and representations about Frank to JPMC, in order to induce JPMC to acquire Frank for approximately $175 million.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT FOUR
### (Securities Fraud)

6.      From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York, and elsewhere, CHARLIE JAVICE, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, JAVICE engaged in a scheme to obtain money from JPMC, by submitting false statements and representations about Frank to JPMC, in order to induce JPMC to acquire the equity shares, options, and warrants of Frank for approximately $175 million, a substantial proportion of which were held by JAVICE.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.      I am a Special Agent with the United States Attorney's Office for the Southern District of New York and I have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Overview of the Fraudulent Conduct

8.      In 2021, CHARLIE JAVICE, the defendant, engaged in a calculated scheme to falsely and dramatically inflate the number of customers at her company, Frank, in order to fraudulently induce JPMC to acquire Frank for $175 million.

9.      In or about 2017, CHARLIE JAVICE, the defendant, founded Frank, a for-profit company that offered an online platform designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school.  JAVICE was Frank's CEO.

10. In or about 2021, CHARLIE JAVICE, the defendant, began to pursue the sale of Frank to a larger financial institution. Two major banks expressed interest and began acquisition processes with Frank. JAVICE represented repeatedly to those banks that Frank had 4.25 million customers or "users." JAVICE explicitly defined "users"—to both banks—as individuals who had signed up for an account with Frank and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number). In fact, Frank had less than 300,000 users.

11. When JPMC sought to verify the number of Frank's users and the amount of data collected about them—information that was critical to JPMC's decision to move forward with the acquisition process—CHARLIE JAVICE, the defendant, fabricated a data set. To do this, JAVICE approached a data scientist and hired him to create an artificially generated data set (a so-called synthetic data set). Then, JAVICE provided that synthetic data set to an agreed-upon third-party vendor in an effort to confirm to JPMC that the data set had over 4.25 million rows, consistent with JAVICE's misrepresentations. Through this process, JAVICE caused the third-party vendor to convey to JPMC that the data set had over 4.25 million rows.

12. In reliance on JAVICE's fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million. As part of the deal, JPMC hired JAVICE and other Frank employees. JAVICE received over $21 million for selling her equity stake in Frank and, per the terms of the deal, was to be paid another $20 million as a retention bonus.

13. Unbeknownst to JPMC, at or about the same time that CHARLIE JAVICE, the defendant, was creating the fabricated data set, JAVICE and a co-conspirator not named herein ("CC-1") sought to purchase, on the open market, *real* data for over 4.25 million college students to cover up their lies. JAVICE and CC-1 succeeded in purchasing a data set of 4.5 million students for $105,000, but it did not contain all the data fields that JAVICE had represented to JPMC were maintained by Frank. JAVICE then purchased an additional set of data on the open market, in order to augment the data set of 4.5 million users. After JPMC acquired Frank, JPMC employees asked JAVICE and CC-1 to provide the data set of Frank users so that JPMC could begin a marketing campaign to those users. In response, JAVICE provided what was supposedly Frank's user data. In fact, JAVICE provided the data she and CC-1 had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users.

14. After an investigation by JPMC, JPMC terminated JAVICE for cause in or about November 2022.

## **Relevant Persons and Entities**

15. Frank was a for-profit company that offered an online platform or tool designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school. Based on my review of an archived snapshot of Frank's website in or about July 2021, a portion of which is depicted below, I know that Frank claimed that the ability to "apply for aid in under 7 minutes" was one of the reasons "[w]hy 4.25 million

students choose Frank."



16.    CHARLIE JAVICE, the defendant, founded Frank in or about 2017, approximately four years after graduating from a finance-focused undergraduate program. JAVICE received various accolades in connection with her role as founder of Frank, such as being selected to the 2019 Forbes "30 Under 30" list in the category "Big Money." JAVICE served as the CEO of Frank until its acquisition by JPMC in or about September 2021.

17.    JPMC is a major financial institution headquartered in New York City. JPMC's deposits are insured by the FDIC.

### JAVICE's Misrepresentations About Frank's "Users" to a Different Bank in June 2021

18.    Based on my review of documents obtained from JPMC, another major bank ("Bank-2"), and from a Manhattan-based investment bank hired by Frank to assist in its acquisition ("Investment Firm-1"), I have learned that, in or about June 2021, prior to the acquisition process with JPMC, Frank began an acquisition process with Bank-2. During that acquisition process, CHARLIE JAVICE, the defendant, supplied the same definition of "user" that she later gave to JPMC. Specifically, I have learned the following, in substance and in part:

a.    In or about June 2021, Bank-2 began an acquisition process with Frank.  During that process, JAVICE represented to Bank-2 that Frank had 4.25 million users. At multiple times in the acquisition process with Bank-2, JAVICE defined "users" as individuals who had signed up for an account with Frank and for whom Frank had collected four particular data points (first name, last name, email, and phone number).

b.    For example, on or about June 28, 2021, JAVICE sent an email to an Investment Firm-1 employee ("Investment Firm Employee-1"). JAVICE provided additional information about retention (*i.e.*, how many Frank users returned to use the platform). In that email, JAVICE referred several times to Frank's "users," writing "This shows when we bring back users to log back into an account (new user data is on new users that we provided monthly prior)."

c.    JAVICE attached to the email an Excel spreadsheet which also contained reference to Frank's users (specifically, "Returning Users" and "New Users"). Also attached was a Word

document entitled "Retention Definitions." Under the heading "Definition," was "User Signup: validated first name, last name, email, phone number, OTP."[1] As described below, this was the same definition of "user" that JAVICE later gave to JPMC.

d.   Ultimately, on or about July 14, 2021, Bank-2 informed JAVICE that it would not proceed further with the acquisition.

### JAVICE's Misrepresentations to JPMC About Frank's "Users"

19.   Based on my review of JPMC records and interviews with witnesses at JPMC, I have learned that CHARLIE JAVICE, the defendant, repeatedly falsely represented to JPMC employees—in oral statements, in electronic communications, in PowerPoint presentations, and in data room documents—that Frank had over 4 million users or customers. The fraudulent representations made by JAVICE while pitching Frank as an acquisition target for JPMC include those described below.

a.   Frank was first brought to the attention of an executive at JPMC who manages acquisitions and strategic partnerships ("Executive-1") in or about March 2021. Frank was an appealing acquisition target for JPMC due to the marketing potential of Frank's large—according to JAVICE—customer base, which consisted of young and diverse students.

b.   On or about July 2, 2021, JAVICE emailed JPMC executives, including Executive-1, "overview materials" for Frank. In the body of the email, JAVICE included "a few highlights." The highlights in the email body indicated, among other things, and under the heading "Growth," that Frank had "5.6M [*i.e.*, million] active households in the US and . . . will end the year with close to 10M families." The attached materials included an 18-page pdf of a PowerPoint presentation regarding Frank (the "July 2 Pitch Deck"). The July 2 Pitch Deck repeatedly represented, falsely, that Frank had 4.25 million users.

i.   For example, the July 2 Pitch Deck represented that there were 4.25 million "Frank Students & Growing," as depicted below.

---

[1] Based on my review of records from JPMC and Bank-2, "OTP" (one-time password) refers to the process of verifying an account by sending a code to a given email account or phone, which is then supplied back to the requesting website.



ii.  As another example, the July 2 Pitch Deck represented that Frank's "users" consisted of "4.25mm Students," as depicted below.



iii.  Similarly, the July 2 Pitch Deck represented that Frank's "Growth" included "1.4mm new Students in 2020" alone. That slide is depicted in relevant part below:



c.  On or about July 6, 2021, Frank opened its data room to various employees of JPMC working on the potential acquisition.

d.  The following day, on or about July 7, 2021, JAVICE presented to JPMC. At the July 7, 2021 meeting, JAVICE delivered a management presentation to JPMC's representatives, which was accompanied by a 60-page PowerPoint deck (the "July 7 Pitch Deck").

    i.  As with the July 2 Pitch Deck, the July 7 Pitch Deck repeatedly represented, falsely, that Frank had 4.25 million customers.

    ii.  Further, the July 7 Pitch Deck specifically referenced Frank's purported 4.25 million student users on a slide titled "Frank Thesis: Distribution is the Power in Fintech," which is depicted below.

## Frank Thesis: Distribution is the Power in Fintech

**Frank's Strategic Value is Derived from:**

- **Acquisition Machine:** We have a powerful distribution channel and relationships with Students that would take a company hundreds of millions of dollars and many years to replicate

- **Better Engagement & Retention:** Our products & services are sticky and run throughout the year

- **Meaningful Data:** We know more about our Students than any lender, college, or employer year over year

Distribution is everything: Apple's payments biz generates $1B in revenue and handles 5%+ of global card transactions. Processing, issuing, customer service, and compliance is all outsourced. $APPL primarily handles marketing and customer acquisition.

**4.25 million Students trust Frank for all their money needs – adding more financial products now has minimal execution risk and is much less expensive**

    iii.  I know from experience and publicly available information that financial professionals commonly refer to the reasons why a particular investment makes sense or is likely to be profitable as a "thesis" or "investment thesis." I also believe, based on the context of the slide, that the slide title's use of "distribution" was a reference to marketing effectiveness.

    iv.  The "Frank Thesis" slide, in particular, claimed that Frank's "strategic value . . . derived from" several points. These points included Frank's "powerful distribution and relationships with Students that would take a company hundreds of millions of dollars and many years to replicate." The slide also included a bullet emphasizing the value of Frank's data. The

bullet stated: "**Meaningful Data:** We know more about our Students than any lender, college, or employer year over year."

       v.  In larger print, the "Frank Thesis" slide stated: "4.25 million Students trust Frank for all their money needs – adding more financial products now has minimal execution risk and is much less expensive."

     e.  At or about the same time, JPMC employees began reviewing the documents in Frank's data room. For example, on or about July 8, 2021, a JPMC employee emailed other JPMC employees a spreadsheet that JAVICE uploaded, or caused to be uploaded, to Frank's data room (the "Spreadsheet"). The subject of the email was "User Breakdown." The JPMC employee wrote: "See attached. They ended 2020 with ~5mm users and expect to end 2021 with ~8mm. Currently on 5.4mm so they have some work to do to hit that target . . . ." I have reviewed the Spreadsheet and observed the following, among other things.

       i.  The Spreadsheet includes several columns tracking data related to Frank's "users."

       ii.  One column is titled "All New Users." The column appears to show the new users that Frank added each month, beginning in March 2017 and continuing through at least June 2021.[2] As shown in the "All New Users" column, the "Grand Total to Date" number of Frank users was represented to be 5,424,449, through June 2021.

       iii.  Several adjacent columns purport to break down the new users in each month by various metrics. In particular, several columns purport to break down the number of new Frank users according to how they were acquired (*i.e.*, which marketing channel resulted in the user acquisition). And several other columns purport to break down the number of new Frank users according to which Frank product is purportedly being used—namely, the columns titled "FAFSA In Process," "Scholarships," "Classfinder," "Aid Appeal," and "Financial Education & College Costs."

       iv.  Notably, as shown in the "FAFSA In Process" column, the total number of students who had used Frank's FAFSA tool to complete, or at least partially complete, a FAFSA was represented to be 4,265,085—*i.e.*, slightly more than 4.25 million, which is the number of student users that JAVICE claimed Frank had.

     f.  On or about July 9, 2021—which was a Friday, and one day after the Spreadsheet was circulated internally at JPMC—a JPMC employee emailed the investment advisors representing JAVICE to thank them for a discussion the night prior, to update them on next steps, and to request due diligence meetings.

     g.  As requested by JPMC, diligence meetings were held the following Monday and Tuesday—on or about July 12 and 13, 2021. Based on my conversations with certain JPMC employees who attended those meetings, and as reflected in contemporaneous notes taken by a JPMC employee in connection with those meetings, JAVICE made clear in the July 12 diligence

---

[2] The number of new users in the months from July 2021 through December 2021 are identified as "Projections."

session what the 4.25-million-users statistic—repeatedly touted in the July 2 Pitch Deck, the July 7 Pitch Deck, and in JAVICE's oral representations—signified. As memorialized in the detailed notes, JAVICE stated in substance and in part that Frank had 4.25 million "[c]umulative users" and a "[u]ser is one who" has provided to Frank his or her "first name, last name, email, [and] phone number."

      h.  After representing to JPMC that Frank had 4,265,085 users, JAVICE directed a JPMC executive ("Executive-2") to the Spreadsheet to further support her claim. Specifically, JAVICE wrote to the JPMC executive, in substance and in part: "[P]lease refer to the data room document 3.1.4 [the Spreadsheet] on user breakdown. The data provided for the analysis is coming from FAFSA in progress point of entry. Other products are not included in the scope of this analysis . . . ."

      20.  In sum, as set forth above, JAVICE repeatedly represented to JPMC, falsely, that Frank had over 4 million users, that approximately 4.265 million of those users had (at least) started using Frank's FAFSA tool, and that Frank maintained (at least) those users' first name, last name, email, and phone number.

## JPMC's Request for Validation of Frank's Users

      21.  Based on my review of records obtained from JPMC, and my interviews of Executive-1 and Executive-2, I have learned that, in early August 2021, JPMC informed CHARLIE JAVICE, the defendant, that in order to close the deal, JPMC would need to validate the number of Frank users, and the quality of data about those users. Representatives of JPMC had numerous communications with JAVICE, both oral and written, in which they detailed the precise information sought by JPMC. Specifically, I have learned the following, in substance and in part:

      a.  A crucial question for JPMC was the number of Frank users and the quality of the data associated with those users (*i.e.*, how much data and what kind of data had Frank collected about those users).

      b.  Executive-1 made clear to JAVICE that validating the number of users and the quality of user data was the primary obstacle to signing the deal.

      c.  JAVICE resisted JPMC's initial attempts to validate the number of users and quality of the data, claiming that she was prevented from sharing that information due to Frank's terms of service with its users. JAVICE ultimately agreed to proceed with the data validation process through the use of a third-party database marketing company ("Vendor-1")—that is, Frank would send the data to Vendor-1 for validation, not directly to JPMC.

      d.  On or about August 1, 2021, Executive-1 sent an email to JAVICE (the "August 1 Email"), with the subject line containing "key data questions." Executive-1 wrote, "Hi Charlie, Per our discussion . . . . How many customer accounts have 100% of the below data? How many customer accounts have partial information? Of partial records, what % include each data field below? Validate the integrity of each of the variables to the degree reasonable." The August 1

Email contained a table of various categories of data, including, for example, student email address, year of school, and marital status. A portion of the table is depicted below:

How many customer accounts have 100% of the below data?
How many customer accounts have partial information? Of partial records, what % include each data field below?
Validate the integrity of each of the variables to the degree reasonable (e.g., data and email fields are captured in the appropriate formats)

| Section | Variable |
|---|---|
| Popup | STUDENT_FIRST_NAME |
| | STUDENT_LAST_NAME |
| | STUDENT_EMAIL |
| | STUDENT_PHONE_NUM |
| Personal | STUDENT_HOME_ADDR |
| | STUDENT_HOME_ADDR_APT |
| | STUDENT_BIRTHDAY |
| | APPLICATION_YEAR |
| Account Flow | STUDENT_MAJR_INTRST |
| My Degree | YEAR_OF_SCHOOL |
| | DEGREE_LEVEL |
| | WILL_HAVE_BACHELORS_CY |

e.   On or about August 2, 2021, Executive-2, along with another JPMC employee, spoke via Zoom to JAVICE about the data validation requirements.  On that phone call, Executive-2 explained that there were approximately 20 data fields for which JPMC required validation. Executive-2 and JAVICE discussed in detail the data fields needing validation. JAVICE proposed using a unique identifier (*i.e.*, a unique value in lieu of the actual information) for certain data fields, including name, email address, home address, and date of birth.

f.   On or about August 3, 2021, after internal discussions at JPMC, Executive-2 emailed JAVICE, writing, "We've had some questions come up on the approach we discussed last night re: Unique ID for PII [personal identifying information]." Executive-2 asked JAVICE whether she was available for a call to discuss. JAVICE responded in the affirmative. On the ensuing phone call, Executive-2 told JAVICE that a unique identifier could be used only for email address and home address.

g.   Later that day, Executive-2 sent JAVICE an email with a template for the data validation report that JPMC sought from Frank (the "Template Report"). Executive-2 wrote, in part, "Per our convo— here is the .xls [spreadsheet] we worked through y[ester]day." The Template Report—which sought validation from Frank of "how many UNIQUE customer accounts exist?" and "Of those records, what % include each data field below?"—is depicted below:

| Data Variable Validation Request Details | | |
|---|---|---|
| How many UNIQUE customer accounts exist? | XXX | |
| Of those records, what % include each data field below? | | |
| **Variable** | **% Captured** | **Comments** |
| STUDENT_FIRST_NAME | X% | |
| STUDENT_LAST_NAME | X% | |
| STUDENT_EMAIL | X% | Provided as Unique ID |
| STUDENT_PHONE_NUM | X% | |
| STUDENT_HOME_ADDR | X% | |
| STUDENT_HOME_ADDR_APT | X% | Provided as Unique ID |
| STUDENT_BIRTHDAY | X% | |
| STUDENT_MAJR_INTRST | X% | Data limited due to application logic |
| YEAR_OF_SCHOOL | X% | |
| DEGREE_LEVEL | X% | |
| CITY_OF_HIGH_SCHOOL | X% | |
| STUDENT_IS_MARRIED | X% | |
| HAS_CHILDREN | X% | |
| MILITARY_STATUS | X% | Data limited due to application logic |
| PARENT_NUM_CHILDREN_FIN_SUPP | X% | Data limited due to application logic |
| STUDENT_COMPLETED_TAX_RETURN | X% | Data limited due to application logic |
| STUDENT_EARNINGS_WORKING | X% | Data limited due to application logic |
| STUDENT_SPOUSE_EARNINGS_WORKING | X% | Data limited due to application logic |
| STUDENT_CASH_ASSETS | X% | |
| NET_WORTH_STUDENT_INVESTMENTS | X% | Data limited due to application logic |
| IS_US_CITIZEN | X% | |
| STUDENT_ADJUSTED_GROSS_INCOME | X% | |
| NUMBER_OF_SCHOOLS_TO_SEND_FAFSA | X% | |

## JAVICE and CC-1's Request to Frank's Director of Engineering

22.     Based on my review of records obtained from JPMC, and my interview of Frank's Director of Engineering ("Engineer-1"),[3] I have learned that, on or about August 1, 2021—the same day that Executive-1 sent CHARLIE JAVICE, the defendant, the August 1 Email seeking additional information about Frank's user data—JAVICE asked Engineer-1 to take the much smaller set of actual Frank data and create a larger, synthetic data set. After raising concerns about the legality of the request, Engineer-1 declined. Specifically, I have learned the following, in substance and in part:

a.   Engineer-1 is a computer engineer and oversaw Frank's back-end computer infrastructure (e.g., the company's servers).

b.   On or about August 1, 2021, JAVICE texted Engineer-1, stating, in substance, that she needed help and would like to speak with Engineer-1. JAVICE then spoke to Engineer-1 by phone.

c.   On the ensuing call, JAVICE told Engineer-1 that she wanted his help to generate a synthetic data set. Specifically, JAVICE told Engineer-1 that she wanted him to use a smaller Frank data set and generate a larger set with the same properties as the original data set.  Engineer-1 was not comfortable with the request, but he responded that he would look into it.

---

[3] Like most of Frank's employees, Engineer-1 moved to JPMC when Frank was acquired. Engineer-1 remains an employee of JPMC.

d.   On or about August 1, 2021, JAVICE sent an email to Engineer-1 and CC-1 with the subject line "User data provided." The email read, "This is the data provided to JPM historically pulled from a mix of google, mix panel, and samples of the database from [another Frank engineer]." Attached to the email was an Excel spreadsheet, which indicated—in a tab titled "FAFSA in Process"—that the total number of Frank users who had at least started a FAFSA was 4,265,085. Based on my interview with Engineer-1 and a Slack[4] conversation, detailed below, in which, following JAVICE's email, Engineer-1 shared the much smaller number of Frank users with JAVICE, I know that the representation that 4,265,085 Frank users had started a FAFSA is false.

e.   On or about August 2, 2021, in advance of a second conversation with Engineer-1, JAVICE sent Engineer-1 an email with the subject heading "Data set." That email contained a link for a website that explained how "to generate synthetic data that is similar to the actual data in terms of statistics and demographics."

f.   On or about August 2, 2021, Engineer-1 took part in a videocall with JAVICE and CC-1. During the call, CC-1 explained, in substance and part, that CC-1 and JAVICE wanted Engineer-1 to assist in generating an artificial, synthetic data set. In particular, CC-1 and JAVICE asked Engineer-1 to supplement a list of Frank's website visitors with additional data fields containing synthetic data.

g.   Engineer-1 was uncomfortable with the request and stated, in sum and substance, "I don't want to do anything illegal." JAVICE and CC-1 claimed to Engineer-1 that it was legal. JAVICE stated to Engineer-1, in sum and substance, "We don't want to end up in orange jumpsuits." Engineer-1 declined the request from JAVICE and CC-1.

h.   After Engineer-1 declined the request, and while Engineer-1 was still on the videocall, JAVICE and CC-1 spoke to each other about obtaining data, like phone numbers, from an external source.

i.   On or about August 2, 2021, at approximately 3:45 p.m., JAVICE emailed Engineer-1 and asked him to "provide me access to the customer data as we need to complete the analysis and I'd like to be able to contribute." Approximately two hours later, Engineer-1 emailed JAVICE a link which provided direct access to the database with user data (the "Access Link Email").  At approximately the same time, Engineer-1 provided JAVICE the password to the user database in a Slack communication.

j.   JAVICE and Engineer-1 then engaged in a Slack chat, set forth in relevant part below. Notably, in this chat, Engineer-1 apprised JAVICE of the precise number of Frank users.

**JAVICE**:   in it!

**JAVICE**:   where would I see the file!

**Engineer-1**:   hold on! Uploading the file!

---

[4] Slack is a messaging platform frequently used by companies and organizations for workplace communication.

**JAVICE**:        🙂

* * *

**JAVICE**:        I only see 142k rows . . is this only completed files vs in progress?

**Engineer-1**:    yes 2checking

**JAVICE**:        I need all started even if its just a first name

**Engineer-1**:    so the number 142K is correct, it's all applications at least started

**Engineer-1**:    2018 apps:  29068
                   2019 apps:  82608
                   2020 apps:  23315
                   2021 apps:  7471

**JAVICE**:        ok.  So nothing in gravity forms or scholarships.  thats the only data capture?

**Engineer-1**:    the only filter I applied was removing the test applications with a http://withfrank.org|withfrank.org email address

**JAVICE**:        kk

**Engineer-1**:    so I can count users who don't have an application

**JAVICE**:        yep

**Engineer-1**:    but since they don't have a FAFSA application, they will not be useful for you

**JAVICE**:        theyll be helpful for everything

**JAVICE**:        im looking to have everything in one place

**JAVICE**:        other thing I did see was college list . . can we add that or double check the variable?

**Engineer-1**:    it's in there as "*college_choices" column*

**Engineer-1**:    so if I count users with no fafsa applications, we get ~293192 records

**JAVICE**:        Exactly

14

**JAVICE**:        Thx

23.     Based on the above Slack conversation, and my interview with Engineer-1, I know that Engineer-1 directly informed CHARLIE JAVICE, the defendant, that Frank had approximately 142,000 users who had at least started a FAFSA and a total of 293,192 users (including those who had signed up for a Frank account, but had not started a FAFSA).

## JAVICE Hires a Data Scientist to Create a Synthetic User Data Set

24.     Based on my review of records obtained from JPMC, my interview of a data scientist and professor ("Scientist-1"), as well as records obtained from Scientist-1, I have learned that, on August 2, 2021—shortly after Engineer-1 had declined the request to create a synthetic data set—CHARLIE JAVICE, the defendant, contacted Scientist-1 and asked him to create the synthetic data set. In JAVICE's communications with Scientist-1, she falsely represented that the data she provided to Scientist-1 was a random sample of a much larger database of Frank users. In fact, the data JAVICE provided to Scientist-1 represented every Frank user who had started a FAFSA. Specifically, I have learned the following, in substance and in part:

a.     On or about August 2, 2021, JAVICE, texted Scientist-1. She wrote, in sum and substance, "I'm in an urgent pinch and wondering if u still do consulting work and have time?" Scientist-1 responded affirmatively and proposed speaking by phone the next morning.

b.     On or about August 3, 2021, JAVICE spoke with Scientist-1 by phone. JAVICE told Scientist-1, in sum and substance, that she had a database of approximately 4 million people and wanted to create a database of anonymized data that mirrored the statistical properties of the original database (the "Synthetic Data Set"). In a subsequent conversation, in response to a question from Scientist-1, JAVICE stated she could not talk about why the Synthetic Data Set was needed.

c.     Also on or about August 3, 2021, JAVICE forwarded to Scientist-1 the Access Link Email sent to her by Engineer-1. JAVICE wrote, "here is the link.  will share credentials offline." Based on Scientist-1's communications with JAVICE, Scientist-1 understood that the data available via the Access Link Email—a data set of approximately 142,000 people—was a random sample of a larger database which contained data for approximately 4 million people.  In fact, that data represented every Frank user who had at least started a FAFSA.

d.     JAVICE provided the specifications for the Synthetic Data Set and told Scientist-1 that he had only approximately three days to create it.

e.     Throughout the day on August 4, 2021, JAVICE and Scientist-1 corresponded about creating the Synthetic Data Set.  That same day, JAVICE wrote to Executive-1 and two other JPMC employees, in part, "I'm currently wrapping up the data . . . will aim to get the data over to you before speaking with the team this afternoon."

f.     Later that same day, JAVICE sent an email to Executive-1 and Executive-2 with the subject heading "Draft Internal data counts."  In the body of the email, JAVICE wrote, "See

15

below.  Happy to chat." Attached was a version of the Template Report, now filled in with values. A portion of report attached by JAVICE is depicted below.

**Data Variable Validation Request Details**

| How many UNIQUE customer accounts exist? | 4,265,085 |
| Of those records, what % include each data field below? | |

| Variable | % Captured | Comments | Count |
|---|---|---|---|
| STUDENT_FIRST_NAME | 100.00% | | 4,265,085 |
| STUDENT_LAST_NAME | 100.00% | | 4,265,085 |
| STUDENT_EMAIL | 100.00% | Provided as Unique ID | 4,265,085 |
| STUDENT_PHONE_NUM | 100.00% | | 4,265,085 |
| STUDENT_HOME_ADDR | 90.21% | Provided as Unique ID | 3,847,533 |
| STUDENT_BIRTHDAY | 90.21% | | 3,847,533 |
| STUDENT_MAJR_INTRST | 48.98% | Data limited due to application addition (added major field in 2019) | 2,088,875 |
| YEAR_OF_SCHOOL | 93.00% | | 3,966,529 |
| DEGREE_LEVEL | 93.00% | | 3,966,529 |
| CITY_OF_HIGH_SCHOOL | 82.99% | | 3,539,731 |
| STUDENT_IS_MARRIED | 81.33% | | 3,468,936 |
| HAS_CHILDREN | 81.33% | | 3,468,936 |

g.    As is reflected in the attached report, the response given by JAVICE to the question "How many UNIQUE customer accounts exist?" is 4,265,085. In addition, JAVICE made further specific representations as to the total number of Frank customer accounts that contained certain types of data. For example, JAVICE represented to JPMC that 3,847,533 unique customer accounts contained data for the student's "birthday."

### Vendor-1 Validates the Synthetic Data Set

25.    Based on my review of records from JPMC, my interview of Scientist-1, as well as records obtained from Scientist-1, I have learned that shortly after Scientist-1, at the direction of CHARLIE JAVICE, the defendant, sent the Synthetic Data Set to Vendor-1, Vendor-1 sent a completed validation report to JPMC, indicating that Frank had 4,265,085 customer accounts. Specifically, I have learned the following, in substance and in part:

a.    On or about August 5, 2021, Scientist-1 emailed JAVICE and confirmed that he had successfully uploaded the Synthetic Data Set to Vendor-1's server.

b.    Later that day, JAVICE emailed Executive-2 a confirmation from Vendor-1 of the uploaded data set and wrote, "Done."

26.    Based on my review of records obtained from Vendor-1 and my interview of a representative of Vendor-1, I have learned the following, in substance and in part:

a.    Vendor-1 is a company that manages data used for marketing purposes.

b.    In early August 2021, Executive-2 asked Vendor-1 to validate data from Frank. Although Executive-2 made the initial request, Frank executed its own processing agreement with Vendor-1.

c.   Neither Frank nor JPMC asked Vendor-1 to verify the authenticity or accuracy of data in the Synthetic Data Set, but instead retained Vendor-1 to count the number of records and verify the percentage of the submitted data fields that were populated with data.

d.   On or about August 5, 2021, a Vendor-1 employee emailed the completed data validation report to JAVICE, and asked for her approval to release the report to JPMC.  JAVICE responded, "I am authorizing you to release the report.  Please do not share additional background."

e.   The Vendor-1 employee replied, "The report has been sent to JPMC." The report submitted by Vendor-1 to JPMC stated, in substance and in part, that Frank had 4,265,085 unique customer accounts.

### JAVICE Directs Scientist-1 to Amend His Invoices

27.    Based on my review of records obtained from JPMC, I have learned that, shortly after the completion of the Synthetic Data Scientist, Scientist-1 sent CHARLIE JAVICE, the defendant, a detailed and itemized invoice which contained references to the generation of artificial data. JAVICE then directed Scientist-1 to send a new invoice which removed those specific references and instead contained a general one-line description of the services provided. Specifically, I have learned the following, set forth in substance and in part:

a.   On or about August 5, 2021, Scientist-1 emailed JAVICE, stating in part, "Attached is my invoice."

b.   The attached invoice, a portion of which is depicted below, contained itemized descriptions of the work Scientist-1 had performed at JAVICE's direction, including "college major generation," and "filling in missing states." The total billed amount was $13,300.

| Date | Time In | Time Out | # Hours | Type | Description |
|---|---|---|---|---|---|
| 8/3/2021 | 14:15 | 15:05 | 0.833 | Data Science Services | Orientation video meeting with Charlie |
| 8/3/2021 | 15:30 | 17:30 | 2.000 | Data Science Services | generating features for projects 2-5 |
| 8/3/2021 | 20:55 | 21:10 | 0.250 | Data Science Services | college major generation |
| 8/3/2021 | 21:45 | 0:20 | 2.583 | Data Science Services | generation of all features except for the financials, zip code lookup fillin |
| 8/4/2021 | 9:15 | 13:05 | 3.833 | Data Science Services | first names, last names, emails, phone numbers, looking into whitepages, unique IDs |
| 8/4/2021 | 13:30 | 19:15 | 5.750 | Data Science Services | group II variables (tax return, financials) + zoom meeting for checkin |
| 8/4/2021 | 19:45 | 1:10 | 5.417 | Data Science Services | college codes and filling in missing states, recoding variables, double checking spreadsheet, on zoom chat |
| 8/5/2021 | 8:30 | 10:00 | 1.500 | Data Science Services | meeting to check over file, phone number validation, file uploading |
| | | | | | |
| | | | | | |
| Total Hours: | 22.17 | | | | |
| Hourly Rate: | $600 | | | | |
| Wage Subtotal: | $13,300.00 | | | | |

c.   JAVICE responded to Scientist-1 that same day, "Can you send the invoice back at $18k and just one line item for data analysis?"

d.   Scientist-1 replied, "Wow. Thank you. Here is the new invoice." Attached to this email was a new invoice, now for $18,000, with the previous specific descriptions removed and replaced by the one-line description, "Data science services."

### JAVICE Purchases Student Data on the Open Market

28.   Almost immediately, CHARLIE JAVICE, the defendant, began efforts to cover up her misrepresentation about Frank's purported 4.25 million student users by purchasing data for millions of students on the open market. In or about August 2021, JAVICE contacted three different companies—using CC-1 and Scientist-1 as intermediaries—that offer data sets of college students for sale. First, CC-1 paid $105,000 to a particular vendor ("Vendor-2") in exchange for a data set of 4.5 million college students (the "Vendor-2 Data Set"). Then, because the Vendor-2 Data Set did not have all the data fields JAVICE had represented Frank maintained, JAVICE attempted to purchase additional data sets that could be used to supplement the Vendor-2 Data Set. At JAVICE's direction, Scientist-1 discussed purchasing data from Vendor-1, but ultimately purchased a supplemental data set from another vendor ("Vendor-3").

*CC-1 Purchases an Incomplete Student Data Set from Vendor-2*

29.   Based on my review of email communications involving CC-1 and Vendor-2, I have learned the following, in substance and in part, about CC-1's purchase of the Vendor-2 Data Set:

a.   On or about August 2, 2021—one day after Executive-1 sent CHARLIE JAVICE, the defendant, the August 1 Email seeking additional information about Frank's user data—CC-1 contacted Vendor-2 regarding the purchase of a data set.  At CC-1's request, a sales manager at Vendor-2 (the "Vendor-2 Manager") emailed CC-1 a summary of a call between them, writing: "You expressed an interest [in] having [Vendor-2] append data elements to your house file. As mentioned we do not have phone numbers. You also inquired about our postal and email databases."  The Vendor-2 Manager's email went on to provide further details about Vendor-2's data files and the prices for purchasing them.  CC-1 then forwarded this email to CHARLIE JAVICE, the defendant, without comment. Later that day, on or about August 2, 2021, after a scheduled call with the Vendor-2 Manager, CC-1 replied to the same email chain with the Vendor-2 Manager and asked, "if we were looking at buying your list of students currently in college, how much would it cost?"

b.   Following further discussions with Vendor-2 representatives, and the testing of a data sample, on or about August 5, 2021, CC-1—working with JAVICE, who authorized the payment on her credit card—paid Vendor-2 $105,500 to obtain a data file of approximately 4.5 million college students. Based on my review of a report from Vendor-2, Vendor-2 provided two data lists to CC-1—one with email addresses, and one without email addresses.  The data list with email addresses had approximately 2,460,489 college students.   The data list without email addresses had approximately 2,039,511 college students.   Thus, the total number of records purchased was exactly 4.5 million.

    c.   On or about August 5, 2021, Vendor-2 sent emails to CC-1 containing hyperlinks from which the purchased data files could be downloaded. CC-1 forwarded those emails to JAVICE, without comment.

*JAVICE Seeks to Supplement the Vendor-2 Data Set*

    30.   Based on my review of records from JPMC, Vendor-1, and Vendor-3, and my interview of Scientist-1, I have learned that, after purchasing the Vendor-2 Data Set, CHARLIE JAVICE, the defendant, sought supplemental data sets to fill in the gaps in the Vendor-2 Data Set. To assist with this project, JAVICE retained Scientist-1, who communicated with potential data vendors on JAVICE's behalf. JAVICE told Scientist-1, in substance and in part, that the data supplementation project was to enhance Frank's preexisting customer list.  At JAVICE's direction, Scientist-1 contacted both Vendor-1 and Vendor-3. Ultimately, Scientist-1 purchased additional data from Vendor-3 and also paid Vendor-3 to append that additional data to the Vendor-2 Data Set, on behalf of JAVICE. Specifically, as set forth below in sum and substance, I have learned the following:

    a.   On or about August 6, 2021—one day after JAVICE and CC-1 purchased the Vendor-2 Data Set—JAVICE discussed the augmentation project with Scientist-1 over email. Scientist-1 wrote to JAVICE stating that Scientist-1 was "thinking about scope" and reaching out to "a few businesses that do this." Scientist-1 asked for "an estimate of the # of names/addresses you wish to match to phone numbers"—whether it was "[t]en thousand, a hundred thousand, [or] a million." JAVICE responded that the "[n]umber would be over 1M."

    b.   Thereafter, Scientist-1 contacted Vendor-1 about the data supplementation project. While JAVICE ultimately did not use Vendor-1 for this project, as described below, JAVICE falsely told Scientist-1 and Vendor-1 that the purpose of this additional data was to augment Frank's own customer data list (rather than the Vendor-2 Data Set).

    i.   On or about August 10, 2021, a Vendor-1 employee emailed Scientist-1 stating, "Thank you for contacting [Vendor-1]. You'd mentioned, 'I'm looking to lookup public phone numbers using names and addresses for 1-2 million people. We are willing to sign a private contract for the scope of this job.' We'd love to hear more. What company is this for, please?" Scientist-1 responded, "I'm a consultant for the company Frank (https://withfrank.org/)."

    ii.   When Scientist-1 stated that he needed provide the purpose of the project to Vendor-1, JAVICE responded falsely, "We are augmenting our contacts to be able to merge our old data with new data." In fact, JAVICE was seeking to supplement the Vendor-2 Data Set that she and CC-1 had purchased days earlier.

    iii.   Similarly, on or about August 17, 2021, JAVICE provided the details of her request to another representative of Vendor-1, copying Scientist-1. She again falsely represented that the data purchased from Vendor-2 was Frank's own customer data set, writing:

    As discussed, we are looking to do the following analysis:

Frank will provide a first name, last name, full address and emails **for Frank students**.  In return, we would receive the DOB, email and phone you have on file for these customer (we only require one for each data field requested) This will enable Frank simply to match records internally on our side. We do not need [Vendor-1] to do the match.

(emphasis added).

c.  While communicating with Vendor-1, Scientist-1 was also in discussions with Vendor-3.  With Scientist-1 acting as intermediary, JAVICE purchased millions of records of data from Vendor-3 and paid Vendor-3 to append that data to the Vendor-2 Data Set, as described in substance and in part below:

i.  After Scientist-1 began discussions with Vendor-3 on or about August 10, 2021, Scientist-1 and JAVICE discussed over email the requirement of a non-disclosure agreement and the purpose of the data request. JAVICE wrote to Scientist-1, "If they can send an NDA back/something so that we know anything provided will be destroyed after would be great." Scientist-1 replied, "I asked them for that stipulation in their NDA. Now the salesman is asking for the purpose of our project in order to make a quote. I can say 'we can't disclose, make a quote anyway' or I can say something plain like 'reconciliation of a customer database for due diligence' or something like that. Can you let me know what you're comfortable with?"  JAVICE responded, "Data augmentation – 'enrich your contacts' is the right one."

ii.  On or about August 12, 2021, Scientist-1 emailed JAVICE, "The sales guy just called me and told me he will throw in email address[es] for free but admits their email database is not too accurate and it's something [they're] fixing now. Their phone database is supposedly very accurate as they've been at it for 40yr." JAVICE responded, "Perfect. I'm ok if not crazy accurate. Something better than nothing."

iii.  The next day, on or about August 13, 2021, Scientist-1 emailed JAVICE with an update regarding Scientist-1's efforts to assess the accuracy of Vendor-3's data. JAVICE responded, "Try running a set from the csv[5] I sent in the Dropbox." In a later email to Scientist-1 that same day, JAVICE confirmed, "I would want any data on a record – phone email or DOB is valuable.  Let's hope we only pay for [it] if phone or email is returned."

iv.  On or about August 16, 2021, Scientist-1 asked JAVICE, "How time sensitive is this project?"  She responded, "Would love this all cleaned up by the 25th if that works." In a follow-up email on the same day, JAVICE told Scientist-1 that the "Green light is there – we just may need another provider to supplement it.  I'm signing this agreement."

v.  On or about August 19, 2021, JAVICE executed the contract with Vendor-3 on behalf of Frank.

---

[5] A CSV ("comma-separated values") file is a text file format frequently used to upload data to a database.

d.   Ultimately, JAVICE purchased millions of records from Vendor-3 and paid Vendor-3 to append those records to the Vendor-2 Data Set.

### JPMC Acquires Frank and Pays Millions of Dollars to JAVICE

31.    Based on my review of JPMC records, I have learned the following, in substance and in part:

a.   On or about August 4, 2021, CHARLIE JAVICE, the defendant, executed an employment and retention agreement with JPMC, which I have reviewed. As part of her employment at JPMC, JAVICE was to receive an annual salary of $300,000, a target annual incentive bonus of $250,000 for 2021, and a retention bonus of $20 million. The $20 million retention bonus would be paid as follows: $5 million would vest one calendar year after the close of the merger, $5 million would vest two calendar years after the close of the merger, and the remaining $10 million would vest three calendar years after the close of the merger. The retention bonus was contingent on, among other things, JAVICE not being terminated for cause.

b.   On or about August 8, 2021, JPMC (through a wholly owned subsidiary vehicle) and Frank executed a merger agreement, which provided, in substance and in part, that JPMC would pay, at closing, $175 million to acquire Frank, including all outstanding equity, options, and warrants.

c.   On or about September 14, 2021, the merger closed. JAVICE, and two trusts for which she is a beneficiary, received approximately $21 million from the merger.[6]  This amount was separate and apart from the salary, incentive bonuses, and retention bonuses that JAVICE was to be paid by JPMC.

### The Fraud Continues Post-Acquisition

32.    Based on my review of JPMC records, including email correspondence provided by JPMC, I have learned that, after the acquisition of Frank by JPMC in or about September 2021, CHARLIE JAVICE, the defendant, provided JPMC with certain data files that were presented as Frank's customer data.  In fact, those data files contained the data that JAVICE had previously purchased from Vendor-2 and Vendor-3 in or about August 2021. Specifically, I have learned the following, in substance and in part:

a.   On or about January 6, 2022, a marketing executive at JPMC (the "Marketing Executive") sent an email to CC-1 with the subject line "Initial Frank User Data Transfer."  This email chain continued through late January and is described below.

i.    In the initial January 6 email, the Marketing Executive requested Frank user data and set forth which data fields to include, as follows:

---

[6] An additional trust for which JAVICE is the beneficiary was due approximately $7 million from the merger, but per the terms of the merger agreement, JPMC ultimately did not pay this amount.

- *The file should be a simple formatted CSV file with the following fields:*
  - Student Name (First/Last)
  - Student Email Address
  - Student Home Address
  - Student Mailing Address
  - Student DOB
  - Student SSN

ii.     In the initial email, the Marketing Executive requested that the file be transferred by January 10, 2022. Later that day, CC-1 responded that CC-1 was "not sure we'll make Monday's deadline" because the Frank engineering team was "bogged down in fixing a critical issue in processing financial aid applications."

iii.     The JPMC marketing team thereafter followed up with CC-1 multiple times. In response to a follow-up email on or about January 18, 2022, CC-1 replied: "Copying Charlie [JAVICE] to this email as she'd got the data ready for transfer.   I'll let you both take it from here." JAVICE then replied: "This will not be coming from me and have our data person on it."

iv.     Eventually, on or about January 21, 2022, an engineer working with the Frank team at JPMC ("Engineer-2"), who was copied into the email chain by JAVICE, transferred a marketing file with data from the Frank team ("Marketing File-1"). Engineer-1 noted that he had merely "uploaded the file that Charlie's [*i.e.*, JAVICE's] team provided."

v.     The same day, a member of JPMC's marketing team responded to Engineer-2 and JAVICE, confirming receipt, and writing: "I can also confirm that there are 1,048,575 records, plus the header row. One observation—1,048,576 rows (total including header) is the maximum # of rows allowed in Microsoft Excel—can we be sure that this is just a coincidence, or maybe there is some data truncation after that row?"

vi.     Based on my own review of Marketing File-1 and the Vendor Data Set-2, I have learned that Marketing File-1 is a subset of the Vendor-2 Data Set—that is, the data that CC-1 and JAVICE purchased for $105,000 at the time of JPMC's data diligence.

vii.     Engineer-2 responded on or about January 24, 2022, stating that he would "look into the issues with first file we sent."  Engineer-2 also explained that he was providing an additional file: "The [Frank] marketing team wanted me to upload another file for you which I uploaded as ["Marketing File-2"]. From what I understand, this file is additive to the previous file. These are our FAFSA application specific users." Marketing File-2 contained data for approximately 135,000 individuals.

viii.     After the JPMC marketing team asked questions about discrepancies between Marketing Files-1 and -2, and the absence of any dates of birth or social security numbers, Engineer-2 forwarded the email chain "internally" to members of the Frank team in an attempt to understand and address the apparent issues with the data files.  Engineer-2 wrote that Marketing File-2 had been "created by [Engineer-1], cleaned by [Frank] Marketing," and had come "[f]rom

ou[r] FAFSA application database." As to Marketing File-1, Engineer-2 explained that he was "not sure about the source of the data" for those approximately 1 million records.

             ix.    As noted above, the source of that data was the Vendor-2 Data Set purchased by CC-1 and JAVICE.

     b.  Materials from JPMC show that JAVICE sent numerous other purported user data files to JPMC. Among those other data files sent to JPMC by JAVICE were files containing data from the Vendor-2 Data Set that had been supplemented with the data purchased from Vendor-3.

     33.    Based on my review of JPMC records and conversations with JPMC representatives, I have learned that, after an internal investigation, JPMC terminated JAVICE for cause on or about November 4, 2022.

     WHEREFORE, I respectfully request that a warrant be issued for the arrest of CHARLIE JAVICE, the defendant, and that she be arrested and imprisoned or bailed, as the case may be.

                                S/ by the Court with permission
                                JEREMY ROSENMAN
                                Special Agent
                                United States Attorney's Office
                                Southern District of New York

Sworn to me through the transmission
of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this
March 31, 2023

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK