**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Lindsay S. Moilanen**
**Daniel Loss**
**Wesley Wintermyer**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004**
**(212) 336-5571 (Loss)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| Plaintiff, | : **AMENDED COMPLAINT** |
| v. | : **23 Civ. 2795 (LJL)** |
| **CHARLIE JAVICE and OLIVIER AMAR,** | : **JURY TRIAL DEMANDED** |
| Defendants, | : |
| -and- | : |
| **CHARLIE JAVICE, in her capacity as Trustee for the CHARLIE JAVICE 2021 IRREVOCABLE TRUST #1, and CHARLIE JAVICE 2021 IRREVOCABLE TRUST #2,** | : |
| Relief Defendants | : |

------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Charlie Javice ("Javice") and Olivier Amar ("Amar") (collectively, "Defendants"),

and Javice in her capacity as Trustee for Relief Defendants Charlie Javice 2021 Irrevocable Trust

#1 and Charlie Javice 2021 Irrevocable Trust #2 (collectively, "Relief Defendants") alleges as

follows:

## SUMMARY

1.      In the summer of 2021, Javice sold the company she founded, Frank,[1] for $175 million to JPMorgan Chase Bank, N.A. ("JPMC").  Through the deal, JPMC was eager to acquire the identity information of Frank's supposed 4.25 million customers or "users"— purportedly students looking to finance their educations—that Javice repeatedly claimed Frank had collected.  JPMC had been seeking to expand its market share for financial services and products to the largely untapped student segment of the population and hoped to use Frank's customer information to target those prospects.

2.      But, as both Defendants knew, Frank did not have 4.25 million student customers or their identifying information.  Javice, as Frank's CEO, and Amar, as the company's Chief Growth Officer, understood that Frank's user data was a significant asset that JPMC wanted, and that JPMC would not pursue an acquisition if it knew the truth:  that Frank in fact had identifying data for only about 300,000 students.  Therefore, to ensure that JPMC went forward with the transaction, Defendants embarked on a fraudulent scheme to (1) hide the fact that Frank had identifying data for only about 300,000 students; and (2) fabricate data to conceal the falsity of Javice's claims.

3.      Prior to the acquisition (which was documented as a merger), Javice repeatedly touted—at times with Amar's knowledge—that Frank had 4.25 million users, and explained in meetings with JPMC employees that those 4.25 million users were students who had provided their first name, last name, email address, and phone number to Frank.  When JPMC asked to review the customer data, Javice paid a university professor to create fake data appearing to represent 4.25 million customers.  Javice then provided that list of 4.25 million data entries to a

---

[1]      The legal name for the company was TAPD, Inc. "Frank" was a doing-business-as alias.

third-party validator, who in turn reported to JPMC that the data contained 4.25 million unique customer accounts with a first name, last name, email address, and phone number.

4.      In need of an alternative in case the university professor did not come through, and aware that JPMC would have access to Frank's real and much more limited student data after the close of the acquisition, Defendants began an effort to create a list of real names that could be falsely passed off as Frank's customers.  To that end, Amar arranged for Frank to pay $105,000 to a third party data compiler for a one-time use of its college student data.  Javice also arranged for Frank to pay $75,000 to a different data compiler to augment the list Amar bought with email and phone number data.

5.      But, after the merger when JPMC used those sham lists to test a marketing campaign by sending emails to a sample of who it thought were Frank's customers, its campaign reached few of the intended recipients, and the marketing email was opened by only a small fraction of those it did reach.

6.      JPMC conducted an internal investigation through which it learned that Frank did not, in fact, have a list of 4.25 million legitimate users and that Defendants had engaged in a months-long scheme to fabricate the data that they knew JPMC was paying $175 million to acquire.

## **VIOLATIONS**

7.      By virtue of the foregoing conduct and as alleged further herein, Defendants Javice and Amar have violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

8.      Defendant Javice further violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

9.      Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Amar aided and abetted Javice's violations of Section 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act, and Rules 10b-5(a) and 10b-5(c) thereunder.

10.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking a final judgment:  (a) permanently enjoining Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (e) ordering Relief Defendants to pay, jointly and severally with Javice, all ill-

gotten gains by which they were unjustly enriched, with prejudgment interest, pursuant to

Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5)

and 78u(d)(7)]; and (f) ordering such other and further relief the Court may deem just and

proper.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15. U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15. U.S .C. § 78aa].

13.    Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities

exchange, in connection with the transactions, acts, practices, or courses of business alleged

herein.

14.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)],

and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and

courses of business alleged in this Complaint occurred within this District, including that

employees of JPMC involved in the Frank acquisition worked from JPMC's Manhattan offices,

Frank was represented in the acquisition negotiations by investment bankers located in

Manhattan, and negotiations over the terms of the acquisition, including at least two in-person

meetings took place in this District.

## **DEFENDANTS**

15.    **Javice**, age 31, resides in Miami Beach, Florida.  At all times relevant here,

Javice was the founder, CEO and a stockholder of TAPD, Inc., a for-profit company,

incorporated in Delaware in 2013, which began doing business as "Frank" in 2017.  As founder

and CEO, at all relevant times, Javice was the public face of Frank, and was the chief negotiator

on behalf of Frank in its acquisition discussions with JPMC.  Javice signed the merger agreement with JPMC on behalf of TAPD, Inc.  At the time of Frank's acquisition, Javice controlled 8 million shares of TAPD, Inc. common stock and 2.5 million common stock warrants.  She received approximately $9.7 million directly in proceeds from the merger, and millions more indirectly, through the amounts JPMC paid to the Relief Defendants for Javice's benefit.  As part of the acquisition, JPMC appointed Javice to a managing director position at JPMC and gave her an employment agreement that included a $20 million retention bonus.

16.     **Amar**, age 49, resides in Port Washington, New York.  At all times relevant here, Amar was Frank's Chief Growth Officer, with responsibility for, among other things, user metrics and growth strategies.  At the time of Frank's acquisition, Amar held approximately 7 million shares of TAPD, Inc.  He received approximately $5 million in proceeds from the merger.  As part of the acquisition, Amar became a JPMC employee and received an employment agreement that included a $3 million retention bonus.

## RELIEF DEFENDANTS

17.     **Charlie Javice 2021 Irrevocable Trust #1** ("Javice Trust 1") is a Nevada trust for which Javice acts as Trustee.  Javice formed the Javice Trust 1 in September 2021.  Pursuant to the merger agreement by which JPMC acquired Frank (the "Merger Agreement"), JPMC directed $4,700,000.11 of the merger consideration (minus amounts charged as selling expenses and amounts escrowed as holdbacks) to Javice Trust 1.

18.     **Charlie Javice 2021 Irrevocable Trust #2** ("Javice Trust 2") is a Nevada trust for which Javice acts as Trustee.  Javice formed the Javice Trust 2 in September 2021.  Pursuant to the Merger Agreement, JPMC directed $6,999,999.96 of the merger consideration (minus

amounts charged as selling expenses and amounts escrowed as holdbacks) to Javice Trust 2.[2]

## RELEVANT ENTITIES

19.     **Frank** was the doing-business-as name of TAPD, Inc., a Delaware corporation, with its principal place of business in New York, New York.  Javice founded Frank in 2017.  Javice sought to make Frank a trusted online source to help students navigate every aspect of the college financial aid process.  Frank offered students a tool to expedite completion of the Free Application for Federal Student Aid ("FAFSA"), a time-consuming task required of students seeking federal grants and loans.  As it grew, Frank also provided students with information on scholarships, financial aid appeals, and college courses.[3]

20.     **JPMC** is a large financial institution, headquartered in Columbus, Ohio.  It acquired Frank in a merger transaction for $175 million in mid-September 2021.

21.     **Investment Bank** is a boutique investment and merchant bank that Javice hired to help Frank find additional investors or to identify a possible acquirer and advise it on any resulting transaction.  Javice was the primary source for the information that Frank's Investment Bank provided to potential investors and acquirers, while Amar also supplied certain data, including information regarding Frank's users and website visitors.

---

[2]     Charlie Javice 2021 Irrevocable Trust #3 ("Javice Trust 3") (also a Nevada trust for which Javice acts as Trustee), was similarly set to receive merger proceeds pursuant to the Merger Agreement.  However, all of the $7,133,805.83 consideration to be paid to the Javice Trust 3 was held in escrow and has not been paid out to Javice Trust 3.

[3]     JPMC ceased operating the Frank website in January 2023.

## FACTS

22.     By 2021, Frank had grown to an online resource for college students and prospective college students across the country.

23.     Frank's primary offering was its automated tool for quick completion and submission of the FAFSA, which attracted students looking for financial aid to finance their educations.  Frank claimed that its automated tool allowed students to complete the FAFSA in a fraction of the time that it typically took to enter the required data manually.

24.     By 2021, Frank had expanded into other areas of interest to these students.  It offered information on available scholarships, resources for pursuing financial aid appeals, and a market place for online college courses offered by third parties.

25.     In presentations Frank made to potential acquirers in 2021, the company claimed that it was "the trusted financial coach for students" and that its mission was "helping [students] navigate finances from A-Z."

26.     In 2021, Frank's website claimed that "4.25 million students choose Frank."

***Frank's Efforts to Sell Itself***

27.     Since inception, Frank had financed its operations and growth primarily through money raised in private placements of its common and preferred stock.

28.     On January 25, 2021, Frank's General Counsel (the "General Counsel"), signed an engagement letter with the Investment Bank on behalf of Frank (the "IB Agreement"). Pursuant to that agreement, the Investment Bank was to act as Frank's "exclusive financial advisor" in connection with any possible transaction by which Frank would merge with or sell itself to a third party.

29.     Under the terms of the IB Agreement, Frank agreed that it would be "solely responsible for the accuracy and completeness of the Offering Materials and represents and warrants that the Offering Materials will not contain any untrue statement of a material fact or omit to state a material fact required to be stated . . . or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading."

30.     Javice read and approved the IB Agreement.

31.     Over the next few months, Investment Bank employees worked with Javice, Amar, and the General Counsel to create pitch decks describing Frank's products and market reach (including data related to the number of users), its financials and anticipated growth, potential new product offerings, and the status and pipeline of its contracts with third-parties for cross-marketing partnerships.  As stated in these decks, which Javice and Amar received, Frank had "4.25mm Students and Growing."

32.     The Investment Bank also worked with Javice, Amar, and the General Counsel to populate a virtual data room with Frank data purporting to support the information in the pitch decks; the data room would be opened to prospective acquirers for their review.

33.     Javice reviewed and approved all pitch decks sent to potential acquirers.

34.     By May 2021, Frank had entered into acquisition negotiations with one financial institution, and Javice presented a pitch deck to that institution touting that there were "4.25mm Frank Students & Growing."  The large financial institution considered acquiring Frank in order to market its financial products to what it believed was Frank's user base of 4.25 million students; ultimately, however, the financial institution decided not to acquire Frank.

35.     In early 2021, a Frank board member approached JPMC about a possible acquisition of Frank.  At this time, JPMC was focused on growing its market share of student

customers and was interested in the leads that Frank offered in that market segment given its touted engagement with over 4 million college-age or college-ready students.

36.     Frank's pitch deck, provided in early July 2021 to JPMC and approved by Javice, included a slide that represented that Frank had "4.25mm Students and Growing."  The 4.25 million student figure was repeated on five additional slides in the pitch deck.

37.     After JPMC signed a non-disclosure agreement with Frank, Frank and the Investment Bank opened Frank's data room to JPMC on July 6, 2021.

38.     Several documents concerning customer data were uploaded to the data room with Javice's approval and Amar's knowledge.  One such document was a spreadsheet that included a column labeled "FAFSA in Process" purporting to show 4,265,085 customers who had started to fill out a FAFSA form using Frank's online tool.  The spreadsheet showed that 2.1 million students had fully completed a FAFSA through Frank.

39.     In later meetings, Javice explained that to begin the FAFSA process through Frank, a user would first open an account and submit his or her name, email address, and phone number.

40.     On July 12 and July 13, 2021, JPMC employees met in Manhattan with Frank representatives, including Javice and, remotely for a portion of the July 12 meeting, Amar, to discuss the information in the data room and to gain a better understanding of Frank's products and customer base.  During both all-day meetings, Javice fielded most of the questions on behalf of Frank.

41.     At those meetings, Javice knowingly or recklessly confirmed the false statements in the data room and the substance of her public statements about the size and nature of Frank's "users":  she claimed that Frank had 4.25 million users.

42.     As Javice defined it at those meetings, a "user" was a Frank website visitor who created a Frank account by submitting their first name, last name, email address, and phone number to Frank.  Javice differentiated "user" from "visitor," explaining that Frank had more than 35 million visitors to its website, but that those visitors would be counted as "users" only when they submitted their name, email, and phone number information.

43.     The kinds of identifying information that had purportedly been provided by Frank users were valuable to JPMC in its efforts to market to and attract new customers in the student population because it would allow JPMC to target those students already familiar with Frank and its financial aid services with marketing materials about JPMC's broader array of financial products and services.

44.     Defendants understood that the student identifying information that Javice claimed Frank had collected, in meetings as well as in documents uploaded to the data room, was important to JPMC.

45.     As Defendants knew or recklessly disregarded, the approximately 4.25 million user number was false.  In fact, Frank had the name, email address, and phone number information for only a fraction—approximately 300,000—of those students.

46.     Javice presented the false number of users to JPMC repeatedly in multiple due diligence meetings and calls.

47.     On July 14, 2021, JPMC submitted a non-binding indication of interest to acquire Frank's outstanding stock for $175 million, subject to confirmatory due diligence.  Frank agreed to grant JPMC a 14-day period of exclusivity, during which JPMC conducted additional due diligence, including additional in-person meetings on July 19 and July 20, 2021.

11

48.     As part of its due diligence and follow-up requests, JPMC asked Javice to provide a list of Frank's customer accounts that included the identifying information Javice had represented Frank possessed.  Javice attempted to dodge requests for specific details to support her "user" claims, citing privacy concerns over sharing such personal identifying information with a third party.  But JPMC insisted.

49.     In an August 1, 2021 email, a JPMC employee asked Javice:  "How many customer accounts have 100% of the below data?," referring to first names, last names, dates of birth, phone numbers, mailing addresses, email addresses, and other variables.  The email also requested the following information:  "How many customer accounts have partial information?  Of partial records, what % include each data field below?  Validate the integrity of each of the variables to the degree reasonable (e.g., data and email fields are captured in the appropriate formats)."

50.     Within minutes of receiving that email, Javice forwarded it to Amar.  Javice then sent Amar a WhatsApp message, stating:  "Need to talk about a data pull and strategy."  Javice quickly followed that up with another WhatsApp message:  "Ur gonna need to block off ur day."

51.     Later on August 1, 2021, JPMC sent Javice an email stressing that its data questions were "critical confirmatory due diligence requests" that were "conditions to closing the transaction."

### ***Defendants Arranged to Provide Fabricated Data to JPMC to Support Javice's False User Representations***

52.     With the exclusivity period at an end, JPMC and Frank worked to resolve the conflict between JPMC's desire to verify Frank's user claims and Frank's stated privacy concerns.

53.     JPMC proposed and Javice accepted the use of a third-party validator (the "Validator").  Pursuant to a data services and non-disclosure agreement with the Validator, Frank would provide the Validator with "up to 4 million records of customer data," without certain personal identifiable information, and the Validator would "validate the coverage of the attribute data" and "then provide a written report regarding the coverage of the attribute data" to JPMC without disclosing any of the actual data Frank supplied.  Specifically, the validation report would report to JPMC "[h]ow many UNIQUE customer accounts exist."

54.     Defendants recognized that they would have to fabricate data to supply to the Validator to hide the fact that Frank actually had identifying information for only a fraction of the approximately 4.25 million users that Javice had claimed.  Defendants agreed that they should ask Frank's Director of Engineering (the "Engineering Director") to supply the missing users by creating "synthetic data" of the users' existence and identifying information.

55.     On August 1, 2021, Javice emailed Amar and the Engineering Director a spreadsheet that purported to show that Frank had 4,265,085 website visitors with a "FAFSA in Process."  As Javice noted in her cover email, this was the "data provided to JPM."  The spreadsheet contained certain general demographic data regarding these visitors on a cumulative basis, such as their geographic location and degree interest.  However, the spreadsheet did not contain their names, email addresses, phone numbers, or other identifying information.

56.     Later on August 1, 2021, Amar sent Javice a WhatsApp message stating that he would send her "the files [she] need[ed]."  In message a few minutes later, Javice asked if Amar knew "how many records" were within the files.  Amar responded that there were "over 100k in one of them," which was a far cry from the approximately 4.25 million users represented to JPMC.

57.     Early on August 2, 2021, Javice emailed the Engineering Director a link to a website that described how to "generate synthetic data that is similar to the actual data in terms of statistics and demographics."

58.     Javice and Amar held a videoconference call with the Engineering Director later on August 2, 2021.  Amar explained to the Engineering Director that he and Javice wanted him to take the information that Frank had available on 4.265 million visitors and use synthetic data techniques to generate identifying information (e.g., names, email address, and phone numbers) for those visitors, using the same demographics present in the real data (e.g., geographic location and degree interest).

59.     Previously, in connection with due diligence meetings with JPMC attended by the Engineering Director, Javice had directed the Engineering Director not to discuss Frank's user metrics in terms of actual numbers with JPMC.

60.     During the August 2, 2021 call with Defendants, the Engineering Director was uneasy with their request.  Fearing that the synthetic data mimicking actual user data that they were asking him to create might be used to attract investors, the Engineering Director asked Defendants whether creating such synthetic data was legal.  Javice assured him that it was and responded that no one would end up in "orange jumpsuits."

61.     The Engineering Director refused to comply with Defendants' request to create synthetic data.  Instead, on August 2, 2021, the Engineering Director forwarded Javice a link to the data of Frank's actual users for whom it had identifying information.  As the Engineering Director explained to Javice in a separate message, over Slack, the data showed "142K" individuals who had "applications at least started."  Javice directed the Engineering Director also to "count users who don[']t have an application."  The Engineering Director responded:  "if [I]

count users with no fafsa applications, we get ~293192 records."  Javice responded:  "Exactly."

62.     While corresponding with the Engineering Director over Slack regarding these data counts, Javice messaged Amar on WhatsApp saying that the Engineering Director's spreadsheet "is only 142k rows which can't be right[.]  We've spent too much $ for emails or first names[.]"  Seconds later, Amar responded:  "No, it makes sense[.]  I think[.]"

63.     Unable to obtain the fabricated data from the Engineering Director, Javice and Amar discussed options for external parties from whom they could obtain data.  On August 2, 2021, Javice sent Amar WhatsApp messages containing links to three websites related to retrieving personal identification information on individuals.  Javice also asked Amar to inform her when he "g[o]t a hold of" Data Compiler 1, a marketing company that boasts "the most comprehensive, accurate and responsive data of high school students, college students, and young adults available anywhere."

64.     Later that day, Amar informed Javice that he had reached out to Data Compiler 1. Amar also wrote, over WhatsApp, that he would "research [additional options] to see if they can take data dumps."  Javice responded:  "[Y]ep.  At this point whoever is quickest to onboard."

65.     Also on August 2, 2021, Javice reached out to a data science professor at a local university whom she had met in college (the "Data Science Professor").  The next day, Javice and the Data Science Professor had a call "to walk through all the data."  Within fifteen minutes of that call, Javice sent Amar a WhatsApp message saying:  "I found my genius.  He says it will take him an hour[.]"  Amar responded:  "Great."

66.     On August 3, 2021, Javice provided the Data Science Professor with the list of approximately 142,000 individuals, which she had obtained from the Engineering Director. Javice retained the Data Science Professor to use "synthetic data" to create 4.265 million

customer names, email addresses, phone numbers, and varying amounts of other identifying information requested by JPMC.

67.     Thereafter, in a series of messages, Javice guided the Data Science Professor in creating a list of fake user data, answering questions from him about how the data should look.

68.     For example, Javice confirmed that the Data Science Professor would "sample first name and last name independently and then ensure none of the sampled names are real."

69.     For address information, Javice and the Data Science Professor agreed that while real addresses would not be used, street names would match actual street names located in the state for that address.

70.     The Data Science Professor warned that because the information he was supplying indicated that many of the "students" were living, and attending high school and college in the same town and state, it "would look fishy" if someone "were to audit it."

71.     When the Data Science Professor advised that it would be difficult to create real-looking email addresses, Javice suggested that he instead insert a "unique ID."  Unique IDs are commonly used to share sensitive real information by replacing the real data with a unique, and random, alphanumeric string.  But Javice was suggesting their use to conceal the obviously fake data, and to create the misimpression that real, but sensitive, data was being protected.

72.     On August 4, 2021, Javice provided the Data Science Professor with a draft data validation "report [that they] would need to make sure matches" to the data that the Data Science Professor was working to generate.  The report was already preloaded with counts showing that Frank had 4,265,085 unique customer accounts with a first name, last name, email address, and phone number.

73.     On August 5, 2021, the Data Science Professor finished generating a list of exactly 4,265,085 "user" accounts with a first name, last name, email address (provided as a Unique ID), and phone number, along with varying amounts of other identifying information.

74.     Also on August 5, 2021, Javice informed Amar via WhatsApp that the Data Science Professor had "[f]inished [the] data" earlier that morning.  Amar asked, "How'[d] it go?," and Javice responded that the Data Science Professor "did a fantastic job.  Truly.  We powered through together."  Amar responded, "Nice."

75.     That same day, Javice directed the Data Science Professor to submit his list of 4.265 million synthetically-generated users to the Validator.

76.     After its review of the data, the Validator advised Javice in an August 5, 2021 email that it had validated that certain fields were "populated versus null/blank."  The Validator attached its "Validation" report that reflected that 100% of the 4,265,085 entries it reviewed had data in the first name, last name, email address, and phone fields.

77.     Javice authorized the Validator to release the report to JPMC, but asked that it "not share additional background" with JPMC.

78.     After the report was delivered to JPMC, Javice requested that the Validator delete the data that Frank had provided through the Data Science Professor.

79.     With their fabricated data now successfully "validated," Javice paid the Data Science Professor for his services.  On August 5, 2021, and in response to his invoice for $13,300, which detailed the work he performed creating the synthetic data, Javice told the Data Science Professor to send back an invoice for $18,000, giving him a bonus.  To avoid creating written evidence of the fabrication, Javice also requested that the Data Science Professor prepare a new invoice containing "just one line item for data analysis."

*In Anticipation of JPMC's Access to the Data Post-merger, Defendants Bought Data to Cover Up their Earlier Deceptions*

80.     On August 8, 2021, JPMC and Frank entered into the definitive Merger Agreement and set the closing date for September 14, 2021.  Javice signed the Merger Agreement on behalf of TAPD, Inc., as its CEO.  Pursuant to the Merger Agreement, JPMC acquired all of Frank's outstanding common and preferred stock for total consideration of $175 million, and Defendants and others from Frank were offered positions with JPMC post-merger. Javice was entitled to a $20 million retention bonus, and Amar was entitled to a $3 million retention bonus.

81.     Javice's employment offer, which she signed on August 4, 2021, stated that performance indicators of her new job would include "expand[ing] [Frank's] engaged customer user base of 4.25 MM households to 10MM+ households over the next three years."

82.     Defendants anticipated that, after the closing, JPMC would soon ask for unrestricted access to Frank's purported list of 4.25 million users.  Recognizing that their scheme would immediately be unmasked if they delivered the data that the Data Science Professor had fabricated, Defendants scrambled to buy data from data providers that at least consisted of real students, even if those students never had a connection to Frank.

83.     To that end, as noted above, even before the Merger Agreement was signed, Amar reached out to Data Compiler 1 at the direction of Javice.  Amar sent the following inquiry to Data Compiler 1 on the morning of August 2, 2021:  "We're looking to augment the marketing data we have to complete the picture.  Would love to speak to someone soon."

84.     Later on August 2, 2021, Amar asked Data Compiler 1 how much it would cost to buy its "list of students currently in college."  Data Compiler 1 responded by recommending that Frank "licens[e] the database for annual use as opposed to renting the data for a one-time use."

Amar spoke to Data Compiler 1 over the phone and kept Javice informed of his conversations with them.

85.     On the morning of August 3, 2021, Javice asked Amar over WhatsApp, "Where are we with [Data Compiler 1]?"  Amar responded that "they're getting back to me today with numbers and a sample."  Later that day, Javice sent Amar the following WhatsApp message:  "I need the data today."  Amar responded that Data Compiler 1 could provide "the 3m at 5 cents," which would cost approximately $150,000.  Javice responded:  "Do it."  Javice signed a credit card order form authorizing Frank to make a maximum $150,000 order from Data Compiler 1.  Amar provided the signed order form to Data Compiler 1.

86.     Also on August 3, 2021, Amar informed Javice via WhatsApp that Data Compiler 1 was sending a "100K test and then we can move on the 3M."  Javice responded:  "They don't have more?  Need 4.5M."  Amar explained that Data Compiler 1 could provide up to seven million records, but that "[o]nly 3M will have emails."  Javice responded:  "[T]hat[']s fine. [A]ddresses are good[,] or phone #[.]"

87.     Later on August 3, 2021, Javice executed a "Data Rental Agreement" between Frank and Data Compiler 1 ("Data Rental Agreement 1").  Amar was listed as Frank's primary contact.  The agreement specified that Data Compiler 1 would send Frank a "random select[ion] of 100,000 records with email (where available)," for the stated purpose of "internal matching" by Frank, for the price of $4,500.

88.     Early on August 5, 2021, Amar pressed Data Compiler 1 to "prepare the lists of 4.5m (2.8m with emails and 1.7m without) as well as confirm pricing" by 3:30 p.m. that day.  He noted that Frank was "rushed" and that if they could not "close this today, we will have to move forward with another vendor as we have limited time with this data scientist and time is ticking."

19

Amar was referring to the desire to share information provided by Data Compiler 1 with the Data Science Professor to incorporate in the Data Science Professor's then-ongoing work.

89.     That same day, Javice pressed Amar to call and email Data Compiler 1, as it was "seriously urgent" to get the data.  Amar responded that he had "spoke[n] to them," would have a meeting with them at 3:30 p.m. that day, and had "told them [he] wanted [the data] ready by then."

90.     After Data Compiler 1 informed Amar that it could provide him with the data that day (August 5, 2021), it asked him if he wanted to increase the number of records without emails, as the "exact count for the email addresses is 2,460,489," which was 339,511 short of Amar's 2,800,000 goal.  Amar confirmed that was his preference, as he wanted the "tot[al]s to be 4.5m."  Within minutes, Amar informed Javice over WhatsApp:  "You'll have 4.5m users today. Just closed it[.]  2.3 cents per user.  [$]105k price."  Javice responded:  "[P]e[r]fect."

91.     Later on August 5, 2021, Javice executed a second Data Rental Agreement between Frank and Data Compiler 1 ("Data Rental Agreement 2").  Amar was listed as Frank's primary contact.  The agreement specified that Data Compiler 1 would send Frank data from its "File Years: 2017 – 2021," for the stated purpose of "internal use" by Frank, for the price of $105,000.

92.     Javice approved the payment of $105,000 for Data Compiler 1's list of 4.5 million students.

93.     On August 5, 2021, Data Compiler 1 emailed Amar links to access data on 4.5 million students broken into two lists of data:  one contained data on approximately 2,460,489 students, including their email addresses; the other contained data on approximately 2,039,511 students, but did not include their email addresses.  Neither list included telephone numbers.

Amar forwarded the links to these lists to Javice.

94.      Early on August 6, 2021, Javice asked Amar to ask Data Compiler 1 "for the exact row count across every data attribute from all the files they sent over" for the following attributes:  "1. First Name. 2. Last Name. 3. Email. 4. Address."  In response to Amar's request, Data Compiler 1 confirmed that both files had "100% of name and address" data populated, but only the "email file" of 2,460,489 students had "100% of email" also populated.  Amar sent this information to Javice.

95.      After Javice learned from Amar that Data Compiler 1's list would not include phone numbers, on August 6, 2021, Javice texted the Data Science Professor.  She wrote: "Weird question – if I have names, emails, physical address for contacts – can we augment the data with phone numbers from white pages database?"  The Data Science Professor agreed to work on the issue and asked her to send him a test batch of data files to which the phone numbers would be appended.

96.      On August 10, 2021, the Data Science Professor contacted Data Compiler 2.  Data Compiler 2 is a public records aggregator.  At Javice's direction, the Data Science Professor informed Data Compiler 2 that the data sought would be used to "enrich . . . contacts."

97.      Javice sent the Data Science Professor the Data Compiler 1 student data that Amar had sent her.  On August 23, 2021, the Data Science Professor sent the Data Compiler 1 data to Data Compiler 2 and asked that they identify matching phone numbers and email addresses associated with that data.

98.      Data Compiler 2 was able to provide email addresses for less than half of the students in Data Compiler 1's data.  On August 29, 2021, Javice instructed Data Compiler 2 to run the student information through their database with just the address information from the

Data Compiler 1 list in an effort to increase the email hits, essentially instructing Data Compiler 2 to provide email addresses found for any person located at the provided address, whether the student or not (the "household email data").

99.     Javice's proposed search parameters increased the number of emails retrieved. On September 9, 2021, Data Compiler 2 emailed Javice and the Data Science Professor data containing approximately 1.9 million email addresses for the approximately 4.5 million student records obtained from Data Compiler 1.

100.     Frank paid Data Compiler 2 $75,000 for its data.

101.     With the data bought from Data Compiler 1 and Data Compiler 2 combined, Defendants now had a list of approximately 4.5 million students with identifying information. Because Frank, through its own business, had attracted only 300,000 students who provided their email, phone number, and other personal identifying information, few (if any) on the lists Javice and Amar had caused Frank to purchase represented students who had actually interacted with Frank.

*JPMC Discovered Javice's Fraudulent Scheme*

102.     The acquisition closed on September 14, 2021, and Defendants, along with a few other Frank employees, became employees of JPMC.

103.     By January 2022, Defendants were still working on the Frank product as JPMC employees.

104.     In January 2022, JPMC sought to begin the cross-marketing of JPMC's financial products to Frank's users.

105.     On January 6, 2022, a team of JPMC employees asked Amar for the "Frank user data" that Javice had told JPMC that Frank possessed, and which had supposedly been validated

by the Validator.  Amar responded that Frank's engineering team was "presently bogged down in fixing a critical issue in processing financial aid applications" and would not be able to meet JPMC's requested four-day "deadline as a result."

106.    In a separate email, not including Amar or Javice, JPMC employees asked an engineering employee working on the Frank product "what the tech issue is with Frank" and whether it was "reported somewhere."  The engineering employee forwarded these questions to Frank's Engineering Director, who was now also a JPMC employee.  None of the employees responded by identifying any tech issues.

107.    On January 14, 2022, Amar held a videoconference call with the Engineering Director to discuss JPMC's request for Frank's user data.

108.    Over WhatsApp, Amar contemporaneously informed Javice that he was "in with [the Engineering Director] now."  Javice instructed Amar to "tell [the Engineering Director] to start with [F]rank files first for data requested," which she clarified were "[t]he fafsa ones."  Amar informed Javice that the Engineering Director "says he never touched the [Data Compiler 1] list," referring to the data lists that Frank procured from Data Compiler 1 for $105,000.  Javice responded:  "[I] know[.]"  Amar then suggested that the Data Science Professor "will have to do the [Data Compiler 1] list."

109.    Later on January 14, 2022, Amar informed Javice that the FAFSA list, pulled by the Engineering Director, contained "140063 FAFSA users with the 5 parameters."  Javice asked Amar to put the file into an Excel spreadsheet.  She later added:  "We'll send it all to [the Data Science Professor] to clean and send as one file" together with the data obtained from Data Compiler 1.

110.    On January 21, 2022, Javice directed an engineering employee working on the Frank product to provide JPMC's marketing team with the data Amar had bought from Data Compiler 1.  The engineering employee did so and, in a later email internal to the Frank group (including Defendants), confessed that he was "not sure about the source of the data" that he had sent JPMC's marketing team.  Neither Javice nor Amar revealed to JPMC the actual source of the data that the engineering employee had provided.

111.    Later, in early February 2022, Javice sent the marketing team an edited version of the combined Data Compiler 1 list with the data obtained from Data Compiler 2, which included the household email data (the "Augmented List").  Despite knowing that both lists had been bought from commercial data aggregators and did not represent actual Frank users, Javice told no one on JPMC's marketing team that the Augmented List contained data that came from anywhere other than Frank.

112.    In July 2022, JPMC's marketing team sampled 400,000 names from the Augmented List to launch a test email marketing JPMC's financial services to what it thought were Frank users.  Of the emails sent to the sample, only 28% of the emails were confirmed delivered to an operational email address, and just 1.1% of those were opened by the recipient. Both statistics were far below the typical delivery success rates experienced by JPMC for its email campaigns.

113.    JPMC conducted an internal investigation regarding the poor results from the email marketing campaign.  Because Frank's historic emails and data had been transferred to JPMC as part of the merger, JPMC discovered Javice's conversations with the Data Science Professor about creating synthetic data to provide to the Validator and the Data Compiler 1 list that Amar had purchased.

114.     As a result of that investigation, JPMC learned that Frank did not have any list of 4.25 million legitimate users with the identifying information Javice had represented it possessed, and that Defendants had engaged in a months-long scheme to fabricate the data that Defendants knew JPMC was paying $175 million to acquire.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Javice)**

115.     The Commission realleges and incorporates by reference herein each and every allegation in paragraphs 1–8 and 10–114.

116.     Javice, directly or indirectly, singly or in concert with others, and in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

117.     By virtue of the foregoing, Javice, directly or indirectly, has violated, and unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Securities Act Sections 17(a)(1) and 17(a)(3)**
**(Amar)**

118.     The Commission realleges and incorporates by reference herein each and every

25

allegation in paragraphs 1–7 and 9–114.

119.     As alleged above, Javice violated Sections 17(a)(1) and 17(a)(3) of the Securities

Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

120.     Amar knowingly or recklessly provided substantial assistance to Javice with

respect to her violations of Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1)

and 77q(a)(3)].

121.     By reason of the foregoing, Amar is liable pursuant to Securities Act Section

15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Javice's violations of Securities Act Sections

17(a)(1)( and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], and, unless restrained and

enjoined, will again aid and abet these violations.

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Javice)**

122.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1–8 and 10–114.

123.     Javice, directly or indirectly, singly or in concert with others, and in connection

with the purchase or sale of a security, used the means or instrumentalities of interstate

commerce or of the mails or of a facility of a national securities exchange (1) to knowingly or

recklessly employ one or more devices, schemes, or artifices to defraud; (2) to knowingly or

recklessly make one or more untrue statements of a material fact or to omit to state one or more

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (3) to knowingly or recklessly engage in one

or more acts, practices, or courses of business which operated or would operate as a fraud or

deceit upon others.

124.    By virtue of the foregoing, Javice violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Thereunder**
**(Amar)**

125.    The Commission realleges and incorporates by reference herein each and every allegation in paragraphs 1–7 and 9–114.

126.    As alleged above, Javice violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

127.    Amar knowingly or recklessly provided substantial assistance to Javice with respect to her violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

128.    By reason of the foregoing, Amar is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Javice's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)], and, unless restrained and enjoined, will again aid and abet these violations.

### FIFTH CLAIM FOR RELIEF
**Violations of Sections 17(a)(1) and (3) of the Securities Act**
**(Amar)**

129.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–7, 10–38, 40, 43–45, and 47–114.

130.     Amar, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails in the offer or sale of securities, knowingly or recklessly has employed one or more devices, schemes or artifices to defraud; and knowingly, recklessly, or negligently has engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

131.     By virtue of the foregoing, Amar directly or indirectly, violated, and unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**
**(Amar)**

132.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–7, 10–38, 40, 43-45, and 47-114.

133.     Amar directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to knowingly or recklessly employ devices, schemes, or artifices to defraud; and to knowingly or recklessly engage in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

134.     By virtue of the foregoing, Amar violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)].

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendants Javice Trust 1 and Javice Trust 2)

135.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–114.

136.    Javice Trust 1 and Javice Trust 2 each received proceeds from JPMC pursuant to the Merger Agreement.

137.    Neither Javice Trust 1 nor Javice Trust 2 has any legitimate claim to those ill-gotten gains.

138.    Javice Trust 1 and Javice Trust 2 each obtained the funds under circumstances in which it is not just, equitable, or conscionable for any of them to retain the funds.

139.    Javice Trust 1 and Javice Trust 2 each has therefore been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Javice, and her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S .C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

### II.

Permanently restraining and enjoining Amar, and his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice

of the injunction by personal service or otherwise, and each of them, from violating, directly or

indirectly, Section 17(a) of the Securities Act [15 U.S .C. § 77q(a)] and Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

## III.

Ordering Defendants to disgorge all ill-gotten gains she received directly or indirectly,

with prejudgment interest thereon, as a result of the alleged violations, pursuant to Sections

21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and

78u(d)(7)];

## IV.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)];

## V.

Permanently prohibiting Javice and Amar from acting as an officer or director of a public

company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## VI.

Ordering Relief Defendants Javice Trust 1 and Javice Trust 2 to pay, jointly and severally

with Javice, all ill-gotten gains by which each of them was unjustly enriched, with prejudgment

interest, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§

78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and

## VII.

Granting such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York
       July 12, 2023

/s/ Antonia M. Apps
ANTONIA M. APPS

REGIONAL DIRECTOR
Tejal D. Shah
Lindsay S. Moilanen
Daniel Loss
Wesley Wintermyer, *pro hac vice*
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-5571 (Loss)
lossd@sec.gov